JOHN C. STOWELL *et al.* Appellees, *vs.* GEORGE J. PRENTISS, Appellant.

*Opinion filed October 28, 1926—Rehearing denied Dec. 9, 1926.*

1. CHARITIES—*what constitutes a charitable use.* Charity, in a legal sense, is not confined to mere almsgiving or to the relief of poverty and distress but has a wider signification and embraces the improvement and promotion of the happiness of man, and a charitable use, where neither law nor public policy forbids, may be applied to almost anything that tends to promote the well-doing and well-being of man socially.

2. SAME—*deed conveying a spring to public use constitutes a charitable trust.* A deed conveying a tract of land surrounding a spring for the purpose of supplying the people of the vicinity, and anyone who might pass, with water without restriction or charge is enforceable in equity as a charitable trust; and the fact that the deed is made out to the directors of a school district, who have no authority to accept such a trust, does not render the deed void, as equity will give effect to the rights of the beneficiaries by the appointment of trustees, if necessary.

3. SAME—*equity will not permit trust to fail for want of trustee.* Equity will not permit a valid charitable trust to fail for want of a trustee or because the trustee designated is incompetent to act, but the court will carry the trust into effect by appointing a trustee or by itself acting in the place of a trustee.

4. SAME—*Attorney General is a proper party to suit involving public charity.* The Attorney General is a proper party, and generally a necessary party, to proceedings affecting the administration or enforcement of a charitable trust for the public benefit, and he may come into the suit by intervention or be brought in by amendment to the pleadings, when necessary, and, in case he should choose to do so, should be given the right to take charge of that portion of the litigation which relates to the public right.

5. SCHOOLS—*school directors or trustees cannot take title to land except for school purposes.* School directors or trustees can not take title to land unless the acquisition of the property in question is germane to school purposes, and where a deed conveying a tract of land to school directors creates a charitable trust for the public generally, the directors cannot take title nor can the equitable interest vest in the trustees.

6. SAME—*school officers can exercise only the powers expressly granted or necessarily implied.* As the powers of municipal or *quasi* municipal corporations are such, only, as are expressly conferred or necessarily implied to make the grant of specific powers effective, school officers, being officers of a municipal corporation, are creatures of the law and can exercise only those powers which are expressly or by necessary implication granted to them.

7. DEEDS—*when a deed creating a charitable trust may be reformed.* Where a deed conveys a tract of land for the express purpose of giving to the public a certain spring described in the deed, but because of an error in the description, due to the use of the word "west" instead of the word "east" in reciting the boundary of the tract, another tract is conveyed which does not include the spring, a court of equity, in a suit to enforce the trust, may decree the reformation of the deed, no adverse rights of third parties having intervened.

8. EASEMENTS—*when public acquires easement by prescription.* Where a deed has conveyed to the public use a tract of land containing a spring near a public highway, the public acquires by prescription an easement over a small tract lying between the highway and the spring, where it has used said tract for nearly sixty years to gain access to the spring, such use being adverse, exclusive, uninterrupted and continuous, and under claim of right which was recognized by the rightful owners during said period of time because the land so used was supposed to have been included in the tract conveyed to the public.

APPEAL from the Circuit Court of Peoria county; the Hon. JOHN M. NIEHAUS, Judge, presiding.

CHESTER F. BARNETT, for appellant.

OSCAR E. CARLSTROM, Attorney General, (WALLACE J. BLACK, and CLYDE M. WEST, of counsel,) for appellees.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

On March 14, 1861, Oliver J. Parkhill owned in fee simple the southeast quarter of the southeast quarter of section 4, township 11, north, range 8, east of the fourth principal meridian, in Peoria county. A public highway ran in a northeasterly and southwesterly direction near the north boundary of the land and the tract was unenclosed. Toward the northeast corner of the land, about 565 feet south of its north line, there was a spring of considerable size, commonly known as the sulphur spring. Water was scarce in the neighborhood at the time, and the inhabitants of the territory within a radius of four or five miles, as well as the general public, freely resorted to the spring to obtain water for domestic and livestock purposes. Early in 1861 Parkhill had under consideration the sale of his land. Certain residents of the neighborhood, fearing that the land might come into the possession of some person who would prevent the use of the spring by others, sought to purchase the spring, with sufficient ground surrounding it to permit access from the public highway, in order that the spring might be preserved permanently for public use. As the result of negotiations it was agreed that for the consideration of $30 Parkhill should sell and convey a tract of land, about three acres in area, containing the spring within its limits and extending from a point south of the spring to the public highway on the north, and that the conveyance should be made so as to insure the use of the spring by the public forever. A local surveyor made a survey to fix and determine the boundaries of the parcel of land to be conveyed. He described it as a part of the southeast quarter

of the southeast quarter of section 4, township 11 north, range 8 east of the fourth principal meridian, "commencing at the east end of the bridge, in the center of the road; thence south 10 degrees east 41 rods to a stone, bearing due south from the center of the spring 6 rods and 19 links; thence north 30 degrees east 16 rods, intersecting the point of the bluff at a stone corner; thence north 10 degrees west nearly parallel with the bluff 34 rods to the center of the road at the foot of the bluff; thence to the place of beginning, 12 rods and 21 links along the center of said road, and containing three and one-fourth acres, more or less." Parkhill was present when the survey was made and accepted it as determining the parcel of land to be conveyed by him. The consideration was paid, and on March 14, 1861, Parkhill by his warranty deed undertook to convey to "the directors of school district No. 1 in the town of Hallock, in the county of Peoria, Illinois, and their successors in office, for the use of the public," the parcel described in the survey, except that by an error of the scrivener the second course in the deed read, "thence north 30 degrees west 16 rods," instead of "thence north 30 degrees east 16 rods." Immediately following the description the deed recites that "the intention of the conveyance is to convey to the public the spring known as the sulphur spring, in said Hallock township, together with all and singular the hereditaments, rights, privileges and appurtenances thereunto belonging or in anywise appertaining. To have and to hold the said premises as above described, with the appurtenances, to the said parties of the second part and their successors in office, forever." By reason of the error the deed did not upon its face purport to convey the parcel which the grantor intended to convey, and the parcel described in the deed as it was drawn did not include the spring or any means of access thereto.

Parkhill died testate on October 31, 1862, and owned at the time of his death all of the southeast quarter of the

southeast quarter of section 4 except the portion conveyed to the school directors. On September 10, 1869, Robert Will, as the executor of his last will and testament, conveyed to Anson A. Prentice "the south and west side of the southeast of the southeast quarter of section four (4), in township number eleven (11), north, range number eight (8), east of the fourth principal meridian, containing 37½ acres." Subsequently, on October 26, 1897, Prentice and his wife, Catherine, by their warranty deed conveyed the tract to George J. Prentiss by the same description, and he has owned it ever since. The tract, except the parcel surveyed to include the spring, was prior to 1871 enclosed with fences. These fences have been since maintained, and have indicated, approximately, the boundary lines of the parcel of land intended to be conveyed to the school directors, except the north line of that parcel, which the public highway has constituted. For many years so much of the parcel of ground in which the spring is situated as lies in the southeast quarter of the southeast quarter of section 4 has not been assessed for taxation but has been marked upon the tax books as public property, not assessable, and no tax has been paid upon it.

The public highway near the north boundary of the southeast quarter of the southeast quarter of section 4 varied from the quarter-quarter-section line, and in consequence a small portion of the northeast quarter of the southeast quarter of that section, north of the parcel of land in which the spring is situated, lay south of the highway. When Parkhill made the deed to the school directors John Scott owned the northeast quarter of the southeast quarter, and Scott, with his wife, by warranty deed dated October 21, 1861, conveyed that 40-acre tract to Anson A. Prentice. Afterwards, on May 27, 1901, Prentice having died prior to that time, his heirs-at-law and the devisees under his will conveyed the same land to George J. Prentiss.

The spring is located in or near the bed of Henry creek, which flows in a general southeasterly direction through the southeast quarter of section 4. During many years high water has deposited sand and gravel upon the ground surrounding the spring. When the deed to the school directors was made the use of these deposits was not considered, since the sole purpose of that conveyance was to provide water for those who sought it. In the course of time, however, the sand and gravel proved to be valuable for the improvement of public highways and in private construction, and considerable quantities were hauled away and used for those purposes. This practice continued until early in 1920, when George J. Prentiss, the owner of the adjoining land, publicly denied the right to remove any sand or gravel from the land which Parkhill had intended to convey to the school directors and forbade all persons to enter upon the land with such an object in view, charging that the removal of the deposits caused damage to his property. For the avowed purpose of preventing such removals Prentiss constructed a substantial fence along the south line of the highway from the northeast corner of the parcel of land in which the spring is located west to the southerly line of the bridge over the creek. He asserted his right to do so because he said that the fence was built within the northeast quarter of the southeast quarter of section 4 and that the land belonged to him. The fence did not prevent the public from reaching the spring but made access to it inconvenient and difficult and to some extent deprived the public of the free and unrestricted use of the water of the spring which theretofore had been generally enjoyed. The use of the land which Parkhill intended to convey to the school directors to gain access to the spring and the free use of the spring as a public source of water supply had been with the knowledge and acquiescence of the owners of the rest of the southeast quarter of section 4 ever since the execution of Parkhill's deed.

On February 18, 1921, John C. Stowell, Elbert I. Nurse and Mrs. John Bridgeman, directors of school district No. 32 in the township of Hallock, Peoria county, the successor to school district No. 1 in the same township existing cn March 14, 1861, as such directors, and also for the use of the people, filed their bill in the circuit court of Peoria county against George J. Prentiss, asking that the deed from Parkhill be reformed to describe the land intended to be conveyed; that the boundary lines of the parcel of land be established and the title thereto quieted and confirmed; that Prentiss be enjoined from interfering with the public use and enjoyment of the land and from encroaching upon it with his fences, and for general relief. Prentiss filed an answer to the bill, and the cause was referred to the master in chancery, who heard the evidence. The master's conclusions were, that by reason of the error in the description the legal title to the parcel of land did not pass from Parkhill but remained in his heirs or other legal representatives, and that there was no right to a reformation of the deed without making the present owners of the legal title parties to the suit; that at the time the deed was made to the school directors Parkhill had no title to or interest in any part of the northeast quarter of the southeast quarter of section 4, and that the deed could not, in any event, be reformed so as to include any part of that 40-acre tract; that the deed conferred no right or authority upon individual members of the public to remove sand and gravel from the parcel of ground in which the spring is located, for their private use; that it was not the purpose of Parkhill to convey the parcel of land to the school directors for school purposes but only as trustees for the use and benefit of the public to assure to it the use of the spring; that the powers of school directors were limited solely to school affairs, and that they had no power or authority to accept a trust or to perform any duties as trustees which did not relate to or concern school affairs, and that the

complainants were without authority to institute the suit. In accordance with his conclusions the master recommended the dismissal of the bill for want of equity. The complainants filed objections to the master's report. These objections were overruled and ordered to stand as exceptions. While the cause was pending before the chancellor on exceptions to the master's report the complainants amended their bill by inserting before the general prayer for relief the specific prayer that if the court should determine that the school directors could not hold the title to the parcel of land and had no authority to prosecute the suit, then, since the property constituted a charitable trust, that the court would appoint one or more trustees to hold the title and to prosecute the suit. Shortly thereafter another amendment to the bill was filed setting forth that Parkhill's will had been admitted to record by the county court of Marshall county; that after the bequests of certain specific legacies he devised the rest of his estate to the American Bible Society, the American Board of Foreign Missions of the Congregational Church, and the Home Mission Board of the Congregational Church, sometimes called the Congregational Home Missionary Society; that he left surviving Alvie Nelson, his niece, and that upon due and diligent inquiry no other heirs of the testator could be found. The devisees, Alvie Nelson and the unknown heirs were made parties defendant. Answers admitting the allegations of the amended bill of complaint were filed by the American Bible Society and the Congregational Home Missionary Society, and the bill as amended was taken as confessed by the other additional defendants. Certain of the exceptions to the master's report were sustained and the rest were overruled. On November 20, 1924, after these proceedings had been taken, a motion was made by the Attorney General for leave to intervene and become a party complainant and to adopt the allegations of the amended bill. The mo-

tion was allowed and the petition was filed. The defendant, Prentiss, demurred to the intervening petition, but the demurrer was overruled and his answer to the bill was allowed to stand as his answer to the petition. Thereafter, on March 6, 1925, a decree was entered, by which (1) the description in the deed from Parkhill to the school directors was corrected and the deed reformed; (2) the public was adjudged to have the right and easement to free and uninterrupted access to the spring from the public highway on the north; (3) Prentiss was permanently enjoined from interfering with the public's free enjoyment of the property, from encroaching upon the use and enjoyment of the waters of the spring by fences, and from interfering with the public's free and uninterrupted access to the spring from the public highway; and (4) he was commanded immediately to remove all·obstructions placed by him between the public highway and the spring which interfered with the public's free and uninterrupted access to and use of the spring. From that decree Prentiss prosecutes this appeal.

Appellant's contentions are: (1) That the conveyance of the property in question did not constitute a charitable trust; (2) that the directors of the school district had no authority to take title to the property; (3) that the deed was void and that there can be no reformation of a void deed; (4) that no right of way by prescription was ever acquired by the public over the part of the northeast quarter of the southeast quarter of section 4 south of the highway, because no particular line of travel was ever followed; (5) that even if a dedication was made to secure the use of the water by the public no other use was granted or acquired, and the removal of sand and gravel from the land is not permitted; (6) that the decree is indefinite in respect of the interference by appellant which is enjoined; (7) that the Attorney General should not have been allowed to intervene; and (8) that the relief granted is broader than the allegations of the bill warrant.

The general objects which might constitute valid charitable trusts were enumerated in the statute of charitable uses, 43 Elizabeth, chapter 4. With the growth and development of society that enumeration was found to omit some of the most important and familiar charitable objects, and both English and American courts have not regarded the enumeration as exhaustive but as designed to be merely illustrative. (3 Pomeroy's Eq. Jur. sec. 1020.) Charity, in a legal sense, is not confined to mere almsgiving or to the relief of poverty and distress but has a wider signification, and embraces the improvement and promotion of the happiness of man. (*Congregational Sunday School and Publishing Society* v. *Board of Review,* 290 Ill. 108.) A charitable use, where neither law nor public policy forbids, may be applied to almost anything that tends to promote the well-doing and well-being of man socially. (*People* v. *Walters Chapter of D. A. R.* 311 Ill. 304.) The deed from Parkhill expressly recited that it was his intention to convey the spring to the public. At the time the conveyance was made persons residing within four or five miles of the spring, and the public generally, resorted to it for water. The spring was practically the only source from which water might be obtained in the territory. While its present use is not so general nor is its need so imperative as it was when the deed was made, yet the use of the spring has continued ever since. The purpose of the conveyance was to supply water, without restriction or charge, to the people of the vicinity and to every person who might pass. The conveyance was a public and not a mere private benefaction, and it is sustainable as a valid charitable trust.

At the time Parkhill made the deed to the school directors the powers of those officers were defined by "An act to establish and maintain a system of free schools," approved February 16, 1857, as amended in 1859 in certain minor particulars. Section 39 of that act (Laws of 1857, p. 271,) provided: "The board of trustees of each town-

ship in the State may receive any gift, grant, donation, or demise, made for the use of any school or schools, or library, or other school purposes within their jurisdiction; and they shall be, and are hereby invested, in their corporate capacity, with the title, care and custody of all school houses and school house sites; but the supervision and control of them is expressly vested in the directors of each district in which said property is situated." The title to school property was by the act vested in the school trustees, but they were not empowered to hold the title to land for other than school purposes. If the acquisition of the property in question by the school directors was germane to school purposes the legal title thereto might be held by them as trustees, the equitable interest vesting in the school trustees; (*O'Donnell* v. *Robson,* 239 Ill. 634; *Heuser* v. *Harris,* 42 id. 425; *Perin* v. *Carey,* 24 How. 465; 1 Perry on Trusts,— 6th ed.—sec. 43;) but where the purposes of the trust are not germane to the objects for the accomplishment of which the municipal corporation was created it has no power to act as the trustee. (*Dailey* v. *New Haven,* 60 Conn. 314; *Augusta* v. *Walton,* 77 Ga. 517; *City of Maysville* v. *Wood,* 102 Ky. 263; *Bullard* v. *Inhabitants of Shirley,* 153 Mass. 559; *Fosdick* v. *Town of Hempstead,* 125 N. Y. 581; *Franklin's Estate,* 150 Pa. St. 437.) The powers of municipal or *quasi* municipal corporations are only such as are expressly conferred upon them or are necessarily implied to make the grant of specific powers effective. (*Eastern Normal School* v. *City of Charleston,* 271 Ill. 602; *Seeger* v. *Mueller,* 133 id. 86.) School officers likewise are the creatures of the law and can exercise only those powers which are expressly or by necessary implication granted to them. While, at law, gifts to charitable uses, without a certain and competent trustee to take and hold the title, may be void, yet a court of equity will carry the trust into effect by appointing a trustee or by itself acting in the place of a trustee. Equity will not permit a trust otherwise valid to

fail for want of a trustee or because the trustee designated is incompetent to act. (3 Pomeroy's Eq. Jur.—3d ed.— sec. 1026; 1 Perry on Trusts and Trustees,—6th ed.— sec. 45; *Wittmeier* v. *Heiligenstein,* 308 Ill. 434; *Churchill* v. *Marr,* 300 id. 302.) The deed from Parkhill expressly recited that it was the intention to convey the spring to the public. A trust was created which was enforcible in a court of equity.

The contention that the deed was void necessarily fails. The lack of capacity on the part of the school directors to hold title to the property did not defeat the trust. Equity will give effect to the rights of the beneficiaries, and the deed was therefore subject to reformation. The error in the description in the deed was apparent on its face. To follow the description literally would exclude the spring from the conveyance, contrary to the intention expressed in the deed. Moreover, the fences erected prior to 1871 indicated the boundaries of the parcel of land which Parkhill intended to convey, and the owners of the adjoining lands acquiesced in those boundaries for approximately half a century. No adverse rights of third parties intervened, and the circuit court properly decreed the reformation of the deed. *Henderson* v. *McKernan,* 151 Ill. 273; *Mills* v. *Lockwood,* 42 id. 111; *Worden* v. *Williams,* 24 id. 67.

It is insisted that a small portion of the northeast quarter of the southeast quarter of section 4 lies south of the public highway; that in crossing it no particular or consistent line of travel was followed, and that in consequence the public never acquired a right of way over that parcel by prescription. The deed to the school directors fixed the center line of the highway as the north boundary of the land conveyed. That boundary, excluding the bridge, was scarcely 200 feet in length. The parcel of land which included the spring extended south from the highway and not from the north line of the southeast quarter of the southeast quarter. The public approached the spring from

any point on the highway within the easterly and westerly boundaries of the land Parkhill intended to convey to the school directors. Every part of the land in the northeast quarter of the southeast quarter south of the highway was used to gain access to the spring. The use was not merely permissive but was adverse, exclusive, uninterrupted and continuous, and was made under a claim of right which was recognized by appellant and his predecessors in title for nearly sixty years. The public acquired the easement to the part of the northeast quarter of the southeast quarter south of the highway by prescription. *Schmidt* v. *Brown,* 226 Ill. 590; *McKenzie* v. *Elliott,* 134 id. 156; *Vail* v. *Mix,* 74 id. 127.

It was adjudged by the decree that the public had the right and easement to free and uninterrupted access to the spring from the highway, and appellant was permanently enjoined from interfering with that access or from encroaching by fences upon the use and enjoyment of the waters of the spring. No use of the property other than the free and uninterrupted access to the spring and the enjoyment of its waters was established by the decree. There was no adjudication that sand and gravel could rightfully be removed from the land, and the decree was not indefinite in respect of the interference by appellant which was restrained. His fifth and sixth contentions cannot, therefore, be sustained.

The public was interested in the enforcement of the charitable trust created by the deed from Parkhill. The Attorney General is a proper, and generally a necessary, party to proceedings affecting the administration or enforcement of a charitable trust. He may come into the suit by intervention or be brought in by amendment to the pleadings, when necessary, and in case he should choose to do so he should be given the right to take charge and control of that portion of the litigation which relates to the public right. (*Newberry* v. *Blatchford,* 106 Ill. 584; *At-*

*torney General* v. *Newberry Library,* 150 id. 229; 11 Corpus Juris, 368, 369.) It follows that the circuit court properly allowed the Attorney General to intervene.

The bill as amended alleged that the public had the right to the use of the whole of the parcel of land which Parkhill intended to convey, and that from the time of the conveyance the owners of the adjoining lands recognized its boundaries and the public had free and uninterrupted access to the spring. By the deed the center line of the highway was fixed as the north boundary of the land conveyed. During all of the years that followed the execution of the deed the land from the public highway to the spring was used in common by all persons who sought water at the spring. No definite line of travel was followed or established but the public made use of the whole and entire parcel. The prayer of the intervening petition was that the rights of the public in that parcel be protected, and, if necessary, that trustees be appointed by the court to hold the title for the use and benefit of the public. In addition to the specific relief sought there was a prayer for general relief, and the relief granted was consistent with the facts alleged. The decree was not, therefore, broader than the allegations of the bill as amended warranted.

The school directors had no power or authority to hold the title to the land as trustees for the public. For that reason the prayer of the bill as amended, and of the intervening petition for the appointment of trustees for that purpose, should have been granted.

The decree of the circuit court will therefore be reversed and the cause remanded to that court, with directions to appoint one or more trustees to hold the title to the parcel of land in question for the use and benefit of the public. In all other respects the decree will be affirmed.

*Reversed in part and remanded, with directions.*