People of State of Illinois ex rel. Thomas J. Courtney, Plaintiff Appellee, v. John P. Wilson et al. Defendants Appellees. Eliel Saarinen, Appellant.

Gen. No. 42,994.

Heard in the second division

of this court for the first district at the February term, 1944. 
 Opinion filed November 20, 1945. Rehearing denied December 10, 1945. Released for publication December 10, 1945.

THOMAS H. FISHER and NORMAN CRAWFORD, both of Chicago, for appellant.

WINSTON, STRAWN & SHAW and WILSON & MCILVAINE, all of Chicago, for certain appellees; JOHN D. BLACK, J. F. DAMMANN and WILLIAM E. BRITTON, all of Chicago, of counsel.

ECKHART, KLEIN, MCSWAIN & CAMPBELL, of Chicago, for certain other appellee; PERCY B. ECKHART and WILLIAM A. MCSWAIN, both of Chicago, of counsel.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

The state's attorney of Cook county brought proceedings in chancery to enforce a charitable trust created under the last will and testament of Kate Sturges Buckingham, late of Chicago, which provided a fund of $1,000,000 for the erection in Chicago of a suitable memorial to Alexander Hamilton, naming as defendants the Art Institute of Chicago, John P. Wilson, Walter B. Smith, A. A. Sprague, Earl Kribben and Chauncey McCormick, as trustees of the fund under her will, and Eliel Saarinen, an architect of Cranbrook Academy, Bloomfield Hills, Michigan.

The complaint sought (1) discovery as to a trust and contract which were relevant to the Hamilton memorial, made by Miss Buckingham in her lifetime; (2) an accounting by the trustees; (3) a construction of the will; (4) a decree that defendants perform the contract alleged to have been let by Miss Buckingham in her lifetime to Saarinen and John Angel, a sculptor, for the construction of a Hamilton memorial; (5) a decree that the memorial designed by Saarinen be completed; (6) an injunction against a transfer of the

trust funds until the memorial should be erected; and (7) the removal of the trustees should they fail to proceed with such decrees. Answers were filed by the Art Institute and the defendant trustees. Although a resident of Michigan, and notwithstanding the fact that no process had been served upon him, Saarinen also answered, and by his counterclaim against the defendant trustees and the Art Institute of Chicago he joined in the prayer of the complaint and in addition thereto sought a money judgment against the trustees for 10 per cent of the cost of the memorial, less $18,000 paid to him by Miss Buckingham in her lifetime, or in the event the defendants not be decreed to build according to the plans and specifications prepared by him, damages for breach of contract in the amount of $50,000. He also asked the court to retain jurisdiction until the memorial should be erected, regardless of delays resulting from the war. The cause was heard by the chancellor without a reference and a written opinion was rendered, pursuant to which a decree was entered as of August 5, 1943 dismissing both the complaint and counterclaim for want of equity. Saarinen alone appeals from the decree; the people of the State of Illinois, acting through the state's attorney, having expressed themselves as entirely satisfied with the decree, refused to appeal.

In his opinion the chancellor painstakingly set forth the undisputed salient facts adduced upon the hearing, fully documented, which were subsequently incorporated in the decree and from which it appears that many years before her death, Miss Buckingham, a patron of art in Chicago, had formed a strong conviction that Alexander Hamilton had not been accorded his proper place in history, and she therefore conceived the idea of erecting a memorial to him in this city. As early as 1928 she created a $300,000 trust fund to carry out that desire and employed several well-known architects for the purpose of obtaining de-

signs and plans for such a memorial. However, she was dissatisfied with all the plans that had been submitted, and in 1931 she entered into negotiations through correspondence with Eliel Saarinen, the counterclaimant, for the purpose of having him prepare designs and plans for a memorial to Hamilton. In addition to the exchange of many letters Saarinen came to Chicago to discuss details and to survey with Miss Buckingham prospective sites. Preliminary water-color sketches were submitted, and finally detailed plans and specifications were prepared, with the result that on February 27, 1933 Miss Buckingham addressed a communication to Saarinen, to which he attaches considerable importance as the basis for his counterclaim. In that letter Miss Buckingham approved the design ''which is the basis of the plans on which you are now working'' and expressed the ''wish that you would proceed to the completion of the necessary plans. The total cost of the memorial is estimated at $300,000.'' She stated as the purpose of her letter a desire to set forth the basis of Saarinen's compensation in connection with the project as follows: ''It is contemplated that you will furnish complete architectural services covering preparation of adequate and satisfactory sketches, working drawings and specifications, letting contracts and supervision of the work, for which your total compensation is to be 10% of the total cost of the memorial.'' And she stipulated ''in the event that the work is abandoned after the completion of working drawings and specifications, but before any supervisory service is required, then your fee will be three-fifths of the total fee contemplated, and this fee will be based upon the estimated cost of $300,000, or a fee of $18,000.00. It is understood that upon the payment of this sum of $18,000.00 all plans, working drawings, specifications, models, etc., are to become my property and may be used by me as I deem best.'' Her letter provided that ''when and if the memorial is built, either by me or by

the executors or my trustees, or by any other person or institution with funds provided by me, you are to furnish the complete architectural service of supervision, as above set forth, and thereupon you shall be entitled to the balance of your fee based upon 10% of the actual cost of the memorial.'' It appears from the communication that Saarinen having already received the sum of $10,000 on account of his services, the balance of $8,000 covering his fee for preparing plans, working drawings and specifications was to be payable upon their completion, and that sum was fully paid by Miss Buckingham during her lifetime. In conclusion she asked Saarinen to indicate his approval by attaching his signature at the foot of the letter and returning it to her, and he signed his acceptance as requested on March 14, 1933.

In the fall of that year Saarinen advised Miss Buckingham by letter that ''all the work'' for the memorial had been completed as far as it could be at that time, that an estimate of the cost of the work from completed drawings had been made, and that due to uncertain labor and material markets of the past month the estimated cost would run considerably in excess of the preliminary figure of $300,000. Miss Buckingham acknowledged that letter on September 5, 1933, and told Saarinen in substance that she was uncertain as to when she could build the memorial. It was in the early part of October 1933 that she sent Saarinen the balance due him under their existing contract, and at the same time she advised him that due to the shrinkage of her assets and the then-existing economic conditions she could not proceed further with her plans to erect a suitable memorial to Alexander Hamilton. From 1933 to 1936 Miss Buckingham did nothing in furtherance of her desired purpose, but in the early part of 1936 she revived the project and retained John Angel of New York City, a distinguished sculptor, to create a preliminary model of a statue of Hamilton. The model he prepared met with her approval, as well

as that of Saarinen, who had been requested by Miss Buckingham to consult with Angel, and in June 1937 the Art Institute, as trustee for Miss Buckingham, contracted with Angel for the completion of the statue. Included in the provisions of this contract was a statement that the statue was to be made by Angel for use in connection with a memorial designed by Eliel Saarinen.

On January 21, 1937 Miss Buckingham executed her last will and testament. The salient portions thereof are as follows:

"It is my desire and intention in my lifetime to provide for the construction of a suitable memorial in the City of Chicago to Alexander Hamilton. In case I shall not have fully accomplished this result prior to my death, or shall not have otherwise provided funds in the sum of at least $1,000,000 to pay therefor, then, and in either such case, I give and bequeath the sum of $1,000,000 . . . to Walter B. Smith, John P. Wilson, Chauncey McCormick, A. A. Sprague and Earl Kribben . . . to have and to hold for the uses and purposes and upon the trust and with the powers following, viz:

"Said trust fund, together with all accumulations therefrom by way of income or otherwise, or so much thereof as may be deemed necessary by said trustees, shall be held, used and applied for the purpose of erecting a suitable memorial in the City of Chicago to Alexander Hamilton. My said trustees are hereby given full power and authority in their unfettered discretion to determine the character, the location and all other questions in connection with or growing out of the erection of said memorial. If the funds given hereunder for said purpose are, in the opinion of my said trustees, not sufficient and adequate for the purpose of erecting said memorial, I authorize and request my said trustees to keep said trust fund invested and to accumulate the income therefrom until in the opinion of my trustees the said trust fund shall be

adequate and sufficient; provided, however, that in no case shall such funds be accumulated for a longer period than ten years after my death. It is my wish and desire that the City of Chicago, or other proper municipal authority, shall set aside a suitable site and location for such memorial without cost to my said trustees. It is my first wish and desire that said memorial be erected. If, however, for any reason, my said trustees shall not within ten years from the date of my death have let contracts for the erection of said memorial, then, and in such case, on the tenth anniversary of my death, the trust hereby created shall cease and determine and the entire trust estate, together with all accumulations thereon, shall become and form a part of my residuary estate hereunder and shall be transferred and paid over by my trustees to the Art Institute of Chicago. I expressly direct that my said trustees shall be under no legal obligation to accept any site which is tendered or offered to them and I hereby authorize and empower my said trustees in their own unfettered discretion to accept or reject any site which is tendered, even though such rejection may cause the failure of the erection of said memorial . . . .

"In case I shall have commenced the erection of said memorial, or have let any contracts in connection therewith, I direct and authorize my said trustees to use said trust fund and all accumulations thereon for the purpose of completing and paying for such memorial . . . . No trustee hereunder shall be liable in any event whatsoever for any mistake in judgment in making or retaining of investments so long as the same. be made or retained in good faith . . . it being my intention to vest in said trustees the same power and control over said trust fund that they would have if they were the absolute owners thereof."

Following Miss Buckingham's death on December 14, 1937 the will and certain codicils were duly ad-

mitted to probate in Cook county. The trustees accepted their trust, and in 1939 received from the executors property constituting the trust funds here in question which, together with certain additions thereto, aggregated approximately $1,000,000.

Long before her death and concurrently with her activities as to the design of the memorial, Miss Buckingham sought an appropriate site. In January 1932 the commissioners of Lincoln Park allocated a site at the bridge across the lagoon of Fullerton Parkway, which she approved. The following May the commissioners approved her suggestions as to profile, design and place. Her plans were then interrupted by the depression until 1936, and when she resumed her consideration of the project she was informed by the president of the Chicago park district that the site was no longer practicable because of changes that had been made on the highways in Lincoln Park. Subsequently sites on the Midway near the University of Chicago and on the causeway between the Shedd Aquarium and the Adler Planetarium were considered and abandoned, either because they could not be had or were not suitable to the type of memorial contemplated. It is conclusively shown, and conceded by Saarinen, that Miss Buckingham never finally selected a site during her lifetime.

On May 20, 1938, after Miss Buckingham's will had been admitted to probate, the trustees had their first formal meeting, the minutes of which disclose that Stuart J. Templeton of the Chicago Bar was authorized to digest the agreements which had been entered into between Miss Buckingham, Saarinen and Angel, and that the trustees discussed problems confronting them with respect to the wishes of the donor, the form of the memorial, and possible suitable sites therefor. At their second formal meeting they decided to confer with Saarinen and Angel at a subsequent date, and voted to have the statue of Alexander Hamilton, there-

tofore modeled by John Angel, the sculptor, cast in bronze. The question of a site was also discussed. Two weeks later they met with Angel and Saarinen. The minutes disclose that Chauncey McCormick, one of the trustees, had viewed a number of prospective sites for the memorial in and about Lincoln Park, together with Angel and Saarinen, and a discussion of their availability and of the photographs, plans and type of architecture suitable for a memorial was had. As a result of these discussions the trustees decided to secure advice, which they subsequently did, from men of unquestioned standing in the fields of art and architecture as to the propriety and suitability of the plans then before the trustees for consideration. At the meeting of the trustees on September 29, 1939 Saarinen and his partner, Robert Swanson, discussed the matter of sites, suitability of material and other matters pertaining to the memorial. On December 10, 1940 the trustees reviewed Templeton's digest of the contracts between Saarinen, Angel and Miss Buckingham, and finally concluded: (1) that the payment of $18,000 to Saarinen constituted a complete discharge of Miss Buckingham's and the trustees' obligation to him for services rendered up to that date; (2) that the trustees were not obligated to proceed with the erection of the memorial in accordance with Saarinen's plans; and (3) that they were free to erect a monument, if they so desired, based on the plans of any other architect whom they might wish to retain. It was at this meeting that Walter B. Smith, one of the trustees, expressed doubt as to the wisdom of building at that particular time a memorial such as was contemplated by Miss Buckingham. He was of the opinion that the time was not ripe to undertake a project of such magnitude, and that in view of the shortage of skilled labor due to national defense projects, it would be inadvisable to do so. Messrs. Sprague, McCormick and Wilson were of like opinion for the additional

reasons that the "unrest of the times made the building of an imposing structure a matter of doubtful propriety" and that "such a project at the time might not receive popular support and sympathy." The advisability of erecting a dignified and simple monument to cost from $100,000 to $200,000 was then considered without official action, but the trustees resolved to notify Saarinen that the then-existing plan for the memorial had been abandoned, and to request him to return to Chicago early in 1941 for the purpose of consulting them with reference to plans for a new memorial, simple in nature and less costly to construct.

In the course of their several discussions as to the form of the memorial, the wishes of Miss Buckingham with respect thereto, the possible suitable sites, and the prior negotiations with the park district, the trustees reviewed the entire matter of the memorial, and particularly the Angel statue. Mr. Rich of the Art Institute, who had inspected the statue at the request of the trustees, reported that it was approximately of the average size from the standpoint of suitability for whatever use it might be put to, and the initial question that the trustees asked was whether or not, if the statue were completed, it could be used in any other type of memorial. They found that it could. Angel testified that at the very time that the trustees told him to complete the statue in June 1939 he felt that on that occasion some of the trustees did not want to go ahead with the memorial, and he expressed himself as pleased with the statue, saying that, "by general approval it is a beautiful thing either by itself or otherwise." The chancellor in questioning Angel elicited from him the opinion that the statue was such that its use was by no means confined to the Saarinen memorial. It appears that Mr. McCormick advised Angel that he would recommend the statue because he considered it would be appropriate in any

memorial or setting in which the trustees might decide to place it.

The reasons for the trustees' decision not to go forward with the Saärinen memorial are clearly set forth in the record. As already stated, they were of the opinion that in view of war conditions the time was not ripe to undertake a project of such magnitude; that the public reaction would be unfavorable, and popular support and sympathy would be lacking; and they were particularly concerned with the size of the memorial. Saarinen's partner, Swanson, testified as to the various dimensions of the memorial as they appeared on the blueprint which had been introduced in evidence. He gave the height of the columns from the bridge floor of the design where the memorial was to stand to the underside of the canopy as 81 feet, 6 inches, and from the underside of the canopy to the top of the canopy, 15 feet. The bridge floor, he stated, was approximately 21 feet above the water of the reflecting pool over which it stood making the top of the dome or canopy more than 100 feet in height. The over-all length of the reflecting pool was stipulated as a mile and one quarter, including approaches. It appears that Miss Buckingham had no real idea of the size of the memorial. In her first letter to Saarinen in April 1931 she said she did not want the memorial to be like a modern skyscraper, and subsequently in 1932 she asked him for the height of the top of the dome from the foundation, but that letter was never answered. Among the outsiders consulted was Philip Goodwin, a New York architect, who had been asked by the trustees to examine and study the plans and models for the memorial, and in his report he stated: ''Its monumentality may prove somewhat overwhelming both for the size of the statue, the position of the monument, and the reason for its erection.'' In speaking of the great responsibility of the trustees to the Chicago pub-

lic he said: "I brought up the question of the 'Albert Memorial' and in confidence, I mentioned to you that I think that such a colossal monument is not suited to the position in which it is being placed. It has not sufficient 'raison d'etre.' In a great city plan I would rather see it inland instead of adding it to the overpopulated shore front of the city." It should be noted that at one of the meetings of the trustees, Saarinen agreed that criticisms by other architects would be appropriate. As a result of outside consultations the trustees ultimately concluded to abandon the Saarinen memorial, and upon trial all of them, except Earl Kribben, who was in Washington on war duty at the time of the trial, testified that they still intend to, and will, construct a suitable but less expensive memorial to Alexander Hamilton.

The trustees contend at the outset that the finding of the decree that there is no obligation on them to complete the Saarinen memorial, standing unappealed from, is the law of this case. They point out that the suit was begun by the people of the State, at Saarinen's request, and that Saarinen was then ostensibly brought into it by the state's attorney who not only refused to appeal from the decree finding there was no obligation on the trustees to complete the memorial, but expressed himself as entirely satisfied with the decree, and that by reason thereof Saarinen, on appeal, can no more insist that the trustees of this charitable trust should be forced to act as he says they should, and erect the memorial designed by him, than he could have initially filed in the circuit court his own bill of complaint making that demand.

■■ Saarinen concedes that a proceeding to enforce or interfere in a charitable trust must be brought on behalf of the people by the state's attorney or attorney general and that he could not have filed his own bill of complaint to accomplish that purpose; and the authorities are fully in accord on that proposition.

*McGee v. Vandeventer,* 326 Ill. 425; *People ex rel. Smith v. Braucher,* 258 Ill. 604; *Attorney General v. Newberry Library,* 150 Ill. 229; *Smith v. Thompson,* 266 Ill. App. 165; Bogert on Trusts and Trustees, vol. 2, Sec. 414; and Scott on Trusts, Vol. 3, par. 391 on ''Who can enforce charitable trusts.'' It follows that since the cause was fully and fairly tried upon a record comprising nearly 4,000 pages and innumerable exhibits, and the state's attorney having refused to appeal from the decree entered because of his entire satisfaction therewith, nothing remains in this sole appeal by Saarinen except his request for additional compensation or damages, and the claim of his counsel ''that Saarinen's reasonable solicitor's fees should have been charged against the fund,'' upon the theory that the language of the will produced a dispute as to its meaning. The authorities are in accord that the right of the people of the State, speaking through their duly authorized officials, the state's attorney or the attorney general, is exclusive, and that having this right and duty, their representative has the right to control the case. *Hesing v. Attorney General,* 104 Ill. 292; *Stowell v. Prentiss,* 323 Ill. 309. This doctrine is so firmly imbedded in the law of this State that the Supreme Court has not only refused to permit anyone other than the authorized representatives of the people to appear in court to enforce a charitable or public trust, but has invariably gone behind the mere name or cloak of the people and dismissed a case where it has appeared that the real party in interest is some individual seeking to further a personal cause. *People ex rel. Moloney v. General Elec. Ry. Co.,* 172 Ill. 129; *Hunt v. LeGrand Roller Skating Rink Co.,* 143 Ill. 118. We would therefore be justified in disposing of this litigation on that question alone and to hold that Saarinen, appealing alone, is now in the same position as he would have been if he had brought the proceedings in his own name, and that the decree of the

chancellor establishes the law of the case and constitutes an adjudication that there is no obligation on the trustees under the will of Miss Buckingham to construct the Saarinen memorial. However, the grave charges interposed against the trustees challenging their good faith and integrity, impel us to accede to the wishes of their counsel to consider the matter fully and in all its aspects, and to determine other questions involved.

Saarinen's counsel characterizes the following as the "vital" paragraph of Miss Buckingham's will: "In case I shall have commenced the erection of said memorial or have let any contracts in connection therewith, I direct and authorize my said trustees to use said trust fund and all accumulations thereon for the purpose of completing and paying for such memorial." It must be conceded, of course, that Miss Buckingham did not "commence the erection of said memorial" during her lifetime, but Saarinen's counsel argues that the above provision should be construed to mean that the agreements made with Saarinen and Angel, together with the course of action pursued by Miss Buckingham in her lifetime, constituted contracts which obligated the trustees under the foregoing provisions of the will to build the memorial designed by Saarinen. The Saarinen contract was made in 1933 and his plans for the memorial were all completed by September of that year, over four years before Miss Buckingham died and three and one half years before her will was made. It is fair to assume that if she had regarded the contract with Saarinen as a commencement of "the erection of said memorial" or as a contract "in connection therewith," she would have said so, and instead of using the language employed in her will, she would have specifically directed the trustees to proceed with the contract she had made. She not only did not do so, but instead used the language quoted and left to the "unfettered discretion" of the

trustees the determination of the character, location and all other questions in connection with the erection of the memorial and the decision to accept or reject any site, even though "such rejection may cause the failure of the erection of said memorial"; and she also added that "if, however, for any reason my said trustees shall not within ten (10) years from the date of my death have let contracts for the erection of said memorial, then . . . the entire trust estate . . . shall be transferred and paid over . . . to The Art Institute of Chicago." Nor do we think that the Angel contract constitutes a commencing of "the erection of said memorial" or a contract "in connection therewith." Any memorial to be erected would necessarily require the figure of Alexander Hamilton, and all agree that the figure was beautiful in itself and could appropriately be used anywhere. When Angel was instructed to complete the figure he was aware that the trustees did not want to go ahead with the Saarinen memorial. Angel's contract with the Art Institute was made June 7, 1937 at the direction of Miss Buckingham under an agreement between her and the Art Institute of May 24, 1937, the provisions of which, and her own expressions and decisions prior to that time, clearly indicate that it was her intention not to regard the Angel contract as one within the language of the will. She began her negotiations with Angel in October 1936, and after some correspondence, Angel in the following January gave his estimate of $30,000 to $38,500 for a 12 or 15-foot statue of Hamilton. On March 29, 1937, two months before the written contract with Angel was signed, she decided to have the statue completed and directed her attorney to prepare the contract and particularly to see to it that it was entirely separate from the Saarinen undertaking. About a week later she wrote Angel that she was definitely going ahead on his estimates, and shortly afterward he sent her a draft of an agreement

with the request that she look it over and sign it. However, her counsel pointed out to her the necessity of having in mind the questions of taxation and a permanent organization to look after the matter and since she had established a fund for the Hamilton memorial, and the trustees of the Art Institute had consented to manage it, he advised that the payments would have to be made out of that fund and that Angel's contract would have to be made with the Art Institute. The fund referred to was covered by prior agreements with the Art Institute and with Walter B. Smith, beginning as early as January 5, 1923, by which Miss Buckingham had provided funds for charitable purposes to be handled by Smith and the Art Institute; and finally through a document of January 14, 1935, Miss Buckingham had provided that upon her death or at a stated time the trust was to terminate and the fund was to be turned over to the Art Institute and to be retained as the Hamilton Memorial Fund. It is this fund which she desired should furnish the needed money for all expenses of the Hamilton memorial, and she so advised Angel. Accordingly, after some correspondence, a contract was prepared between the Art Institute and Miss Buckingham, dated May 24, 1937, but it could not be executed until a meeting of the trustees of the Art Institute scheduled for June 3, 1937. Prior thereto, on May 15, 1937, Angel was asked to prepare a contract with the Art Institute expressing the agreement he and Miss Buckingham had reached. He complied with her request and returned the agreement on June 4, 1937, which was formally executed on June 7 and which was identical with the one drawn and submitted by him to Miss Buckingham in April, except that the Art Institute was substituted for her, indicating that Angel and Miss Buckingham had reached a complete agreement as to its terms two months previously. In these circumstances it becomes important to inquire what Miss

Buckingham said with reference to the Hamilton memorial in her contract of June 3 with the Art Institute. She did not instruct the trustees named in that contract to construct the memorial in accordance with the design of Saarinen, but left the matter entirely to their discretion, and confined her positive instructions to the completion of the Angel statue. It is significant that on June 3, 1937, two months after Miss Buckingham had made all her arrangements with Angel for the making of the statue, she included the following provision in her agreement with the Art Institute: "If for any reason contracts for the erection of said Memorial are not let within ten (10) years of the date hereof, then and in such case, at the expiration of ten (10) years from the date hereof, said Trust Fund shall be relieved from the restrictions and obligations herein imposed and shall thereafter be held by said Second Party [the Art Institute of Chicago] as a permanent fund, the net income from which may be used, so far as it may be advantageously used for that purpose, for the maintenance and enlargement of the collections heretofore and hereafter given to said Second Party by said First Party [Miss Buckingham], and any excess of such income not so used shall be used in making additions to said collections by extending the same to objects kindred in their nature to those already included in said collections. All additions and extensions to said collections shall be made under the direction of a Committee appointed by the Board of Trustees of said Second Party, and under the advice of competent experts."

Shortly after the execution of these contracts Miss Buckingham wrote to the president of the Chicago park district expressing dissatisfaction with certain suggestions he had made as to the type of memorial she might construct, and stated that she had appointed a committee consisting of John P. Wilson, Walter B. Smith and Chauncey McCormick to act in the matter

for her, and expressing the hope that some suitable, mutually acceptable location for the monument would be agreed upon. It is inconceivable that she would have said what she did in the quoted portion of her agreement of June 3 with the Art Institute and would have so expressed herself in the letter to the president of the Chicago park district, if she had regarded the Angel contract to be, within the language of the will and within the language of the Art Institute contract, a commencing of "the erection of said memorial or" a contract "in connection therewith." From the foregoing circumstances we are satisfied that neither the Saarinen contract nor the Angel contract, in fact, constituted the commencement of the memorial or contracts in connection therewith and that neither of them was ever so intended by Miss Buckingham.

It is urged by Saarinen that "a bequest to trustees for a charitable purpose given subject to a direction that they carry out a designated contract creates an equitable charge against the bequest, and a court of chancery has as part of its general equity jurisdiction the power and duty of enforcing such an equitable charge." *Ingraham v. Ingraham,* 169 Ill. 432; *Moody Bible Institute of Chicago v. Pettibone,* 289 Ill. App. 69; *Bailey v. Bailey,* 115 Ill. 551; *Arnold v. Arnold,* 325 Ill. 500, and other decisions and text-writers are cited in support of that proposition. We think that doctrine is inapplicable to the circumstances of this case because it assumes that the giving of the bequest to the trustees was subject to a direction that they carry out a designated contract. An equitable charge upon property bequeathed by a testator presupposes a debt or legacy, and the cases cited by Saarinen so hold. In the *Ingraham* case the testator's will specifically provided that a legacy in favor of his nephews and nieces should be a charge on the property bequeathed by the residuary clause of the will. In *Arnold v. Arnold* and in *Moody Bible Institute of*

*Chicago v. Pettibone* a similar situation existed. In this proceeding it was conclusively shown that Miss Buckingham was not in any wise obligated to Saarinen at the time she died; the only obligation imposed by the will or trust on the trustees was to complete the erection. of such memorial as Miss Buckingham might have commenced to erect or for which she might have contracted, and as heretofore shown, neither of these exigencies existed. Moreover, it appears to be the rule that in order to subject the property of a testator to the payment of legacies, the intention of the testator must clearly appear either from the express language of the will or by fair and necessary implication from the terms of the will. Pomeroy's Equity Jurisprudence, 4th Ed., Vol. 3, Pars. 1244 and 1245; *Heslop v. Gatton,* 71 Ill. 528. Miss Buckingham's will expresses no such intention. The interest of Saarinen, so far as her intention was concerned, was collateral to the construction of a memorial, if she had committed herself to erect one, or if her trustees decided, if ever, to adopt Saarinen's plan. There was no debt upon which an equitable charge could be based.

Another argument advanced by Saarinen is that a will should be construed so as to favor a charity. His counsel argues that the construction of the will urged by counterclaimant is one that redounds to the interest of the general public; that Miss Buckingham's clear intention was to have the memorial built pursuant to the Saarinen design; that the trustees are hostile to this intention and indicated that they will not carry it out; that "if the Saarinen design is not used, a small part of the bequest will probably some day be spent to erect the John Angel statue of Hamilton without any real 'memorial' being built at all"; that thus the balance of the fund will be made to pass as part of the residuary estate under the will to the Art Institute to be used for the exclusive purposes designated; and that the public will be deprived of a memorial in Chi-

cago to a great American. In this proceeding there were two charities involved, the Hamilton memorial and the disposition of the balance, if any, to the Art Institute for special purposes. Whether counterclaimant approves of the purposes defined in the residuary clause in Miss Buckingham's will is beside the point. As a patron of art Miss Buckingham bestowed many benefactions on the Art Institute, and the residuary clause provided for the maintenance and enlargement of collections given to the Art Institute by the will, which included drawings of Thomas Rowlandson, etchings and paintings, Staffordshire cottage ornaments, Gothic furniture, and Japanese prints, etchings and engravings.

In his answer to the complaint filed by the state's attorney Saarinen admitted the allegations of paragraphs 1 to 19, which included charges based upon information and belief against the trustees, which was tantamount to joining in those charges. Paragraph 16 alleges that two of the trustees of the Hamilton Memorial Fund are also trustees of the Art Institute; that Chauncey McCormick is also vice president and Walter B. Smith treasurer of the Art Institute; that the interests of the trustees of the Memorial Fund are in conflict with those of the Art Institute; and that Smith and McCormick as the executors of Miss Buckingham's estate and as trustees and officers of the Art Institute and trustees under her will have, with other trustees of the Memorial Fund, conspired and confederated with the other trustees and officers of the Art Institute to the end that all or substantially all of said charitable trust fund in the sum of $1,000,000, together with all accumulations thereon, after the deduction of a relatively trivial amount, shall and will be paid to and held by the Art Institute for its unrestricted use, in complete defiance of the terms of said gifts and of the true construction and meaning of the

last will of Miss Buckingham and of her wishes and intentions expressed during her lifetime, and in breach of the contracts which she entered into with Saarinen, Angel and the Art Institute. The chancellor found that the trustees acted in good faith and within their unfettered discretion; that they have not breached their trust in failing to build the memorial, and that the charge contained in the complaint and adopted by the counterclaimant, that the trustees conspired to defeat the primary purpose of the will so as to cause the $1,000,000 trust fund to revert to the residuary legatee, the Art Institute of Chicago, was not supported by the evidence. As a matter of fact there was no evidence whatever to support the charges challenging the good faith and integrity of the trustees, but counterclaimant seeks to draw an inference that because some of the trustees of the Hamilton Memorial Fund were also trustees and officers of the Art Institute, they conspired to divert the fund to the Art Institute as residuary legatee. The chancellor found that Chauncey McCormick and Walter B. Smith in the life of Miss Buckingham acted as advisers to her in many of her affairs, that she knew of their association with the Art Institute and that they held official positions with it; that with full knowledge of these facts at the time of making her will, she made them trustees and had great faith and confidence in them; that in all their individual actions, notwithstanding they were officials of the residuary legatee, they acted in the highest of good faith, and that by her will she expressed gratitude for the aid and help given her by Mr. Smith in his lifetime and made him the beneficiary of a very substantial legacy by reason of this great trust and confidence reposed in him. In view of the close relationship between Miss Buckingham and these two trustees under her will, who were also trustees and officers of the Art Institute, and her full knowledge of the dual

capacity in which they acted, the charge of conspiracy and bad faith, without any supporting evidence, is a scandalous and unfounded accusation.

Saarinen's counsel claims that he is entitled to fees because the case involves an ambiguity in the will of Miss Buckingham. We think the will clearly expresses her wishes and requires no construction. In fact counsel seems to agree with this conclusion because in the second paragraph of his statement of facts he says that "in the whole history of our law, probably no other case involving the construction of a will has ever been tried in which the intentions and desires of the testator have been so overwhelmingly proven over such a long period of years by written documents and by actions culminating in the provisions of the will itself." Saarinen's entire case is predicated on the proposition that events *subsequent* to the making of the will demonstrated that contracts had been entered into and commitments made which required the trustees to erect the Saarinen memorial, and in the course of that erection to employ Saarinen to supervise it and to pay him accordingly. The will itself is clear and unambiguous, and Saarinen, in any view, is merely a claimant against the estate, and has no right to interject his claims in a proceeding of this kind. Under the circumstances his counsel is not entitled to fees.

In the light of what has been said we think the chancellor properly denied the request for the removal of the trustees and also for an accounting, which the state's attorney, representing the people, alone had the right to prosecute. The decree denied him that right and he expressed his entire satisfaction with the findings of the chancellor and the decree. For the reasons indicated we are of opinion that the decree should be affirmed in its entirety, and it is so ordered.

*Decree affirmed.*

Scanlan and Sullivan, JJ., concur.