JUSTICE ALLOY
 

 delivered the opinion of the court:
 

 The office of the State Fire Marshal, State of Illinois, appeals from the decision of the circuit court which set aside an order of the Fire Marshal directing the Board of Education of Minooka Community High School District No. Ill (hereinafter Board of Education) to remedy certain conditions at the high school building. The Fire Marshal’s order would have brought the building into compliance with the Fire Marshal’s Rules and Regulations for Fire Prevention and Safety. (See Ill. Rev. Stat. 1981, ch. 127½, par. 9.) The court, in reversing the order of the Fire Marshal, found that the school building was in compliance with rules and regulations set forth in the Life Safety Code (see Ill. Rev. Stat. 1981, ch. 122, par. 2 — 3.12), promulgated by the State Board of Education. The court concluded that the applicable rules and regulations for fire safety in the school building were those of the Life Safety Code, not the Fire Marshal’s Rules and Regulations. The issue on this appeal is which set of safety regulations and requirements were applicable to the high school building.
 

 The record reveals that the Minooka High School building was constructed in 1970, with additions added in 1976 and 1977. At the time of its construction, it was built in compliance with the Life Safety Code, promulgated by the State Board of Education. The Life Safety Code was originally promulgated by the State Superintendent of Schools (now the State Board), pursuant to legislation directing that he had a duty:
 

 “To prepare for school boards with the advice of the *** State Fire Marshal specifications for minimum requirements for *** safety against fire which will conserve the health and safety of the pupils of the public schools.” (Ill. Rev. Stat. 1981, ch. 122, par. 2 — 3.12.)
 

 Such obligation and authority had been conferred upon the State Superintendent of Schools since early in this century. The Life Safety Code, addressing all manner of construction requirements for school buildings, was promulgated and adopted in 1965, and numerous school buildings in the State have been built in accordance with its specifications and standards. The State Fire Marshal has, pursuant to statutory direction above stated, provided advice concerning the rules respecting fire safety for school buildings.
 

 The Minooka High School building was inspected by the State Fire Marshal in 1970, after construction, and approved at the time. It was examined by the Regional Superintendent of Schools in 1980 and 1981, and he certified its continued compliance with the Life Safety Code. In July 1981, deputies from the office of the State Fire Marshal, acting under authority set forth in section 3 — 14.22 of the School Code (Ill. Rev. Stat. 1981, ch. 122, par. 3 — 14.22) and section 9 of “An Act relating to the investigation and prevention of fire“ (III. Rev. Stat. 1981, ch. 127½, par. 9), inspected the Minooka High School building. After the inspection, the Fire Marshal cited the plaintiff Board of Education for a variety of violations. These violations were premised not upon the rules and regulations of the Life Safety Code, under which the building had been constructed and operating, but rather upon rules and requirements of the Rules and Regulations for Fire Prevention and Safety (hereinafter Grey Book) promulgated by the State Fire Marshal. The Grey Book is a promulgation by the Fire Marshal, pursuant to his authority and obligation to adopt rules necessary for safe construction of buildings within the State. (Ill. Rev. Stat. 1981, ch. 127½, par. 9.) There appears to be no dispute between the parties that this school building met the requirements of the Life Safety Code and did not meet the requirements of the Grey Book.
 

 The evidence indicated that compliance with the order of the Fire Marshal would cost somewhere between $9,000 and $31,000, and possibly more if replacement of the air system were required as a result of the removal of louvered doors in the building. Funds were not allocated for the changes, the Board taking the position that its compliance with the Life Safety Code was sufficient. The Board appealed to the circuit court (Ill. Rev. Stat. 1981, ch. 127½, pars. 10, 11) for review of the Fire Marshal’s order. The Illinois State Board of Education petitioned for and was granted leave to intervene in the matter.
 

 The circuit court found that it was faced with two facially applicable codes for fire safety at the school building, which codes were conflicting as to their requirements. The trial court applied the general rule of statutory construction favoring a specific provision over a general provision where two are in conflict, and it found that the Life Safety Code applied to this building, since it was considerably more specific in the requirements and specifications relating to fire prevention and fire safety. From the order of the circuit court the Fire Marshal appeals, and he argues the court erred in its construction of applicable statutory provisions.
 

 Rules respecting statutory construction are well established, the cardinal rule being that such interpretation is to determine the intent of the legislature and to effect that intent. (General Motors Corp. v. Industrial Com. (1975), 62 Ill. 2d 106, 112, 338 N.E.2d 561; People ex rel. Anastasia v. Civil Service Com. (1973), 10 Ill. App. 3d 583, 586, 295 N.E.2d 127.) The legislature’s intent is to be ascertained from an examination of the language used, the evil to be remedied and the object to be attained. (City of Champaign v. Hill (1961), 29 Ill. App. 2d 429, 444, 173 N.E.2d 839.) The initial and primary source for determining legislative intention is the plain meaning of the language used, and where unambiguous, that plain meaning of the language controls. General Motors Corp. v. Industrial Com. (1975), 62 Ill. 2d 106, 112; Hah v. Stockier (1978), 66 Ill. App. 3d 947, 951, 383 N.E.2d 1264.
 

 The defense’s principle argument focuses upon an amendment to the School Code adopted by the legislature in 1975. Section 3 — 14.22 of the School Code, prior to its amendment, imposed a duty upon county superintendents to request inspections of buildings by various offices or persons when it appeared to him that the building or buildings were unsafe, unsanitary or unfit for occupancy. The second paragraph of that provision stated:
 

 “The provisions of this Section shall not preclude inspection of school premises and buildings pursuant to Section 9 of ‘An Act in relation to the investigation and prevention of fire and dangerous conditions in and near buildings and other structures,’ approved June 15, 1909, as now or hereafter amended, although not requested as hereinabove provided. However, the findings of any such inspection shall be advisory only.”
 

 The 1975 amendment deleted the final sentence of the second paragraph, which had stated that the findings of the Fire Marshal would be advisory only. The Board here admits that the intent behind this change was to give the State Fire Marshal the authority to inspect public schools, without prior request, and to make binding findings concerning violations. In this, the Board agrees with the Fire Marshal. However, disagreement arises as to which standards will be applied by the Fire Marshal in his inspections and findings. The Fire Marshal contends that by virtue of the reference to section 9 of “An Act relating to the investigation and prevention of fire,” section 3— 14.22 of the School Code must be construed to establish the Grey Book, promulgated under the same section 9, as the standard to be applied in such inspections.
 

 Although the Fire Marshal’s construction is an arguably correct construction, we do not find it clearly evident from the statutory provision in issue. In the first place, the emphasis in the second paragraph of section 3 — 14.22 of the School Code is upon inspections, absent requests for such by the Superintendent. The plain language of the provision indicates a concern that the grant of authority, respecting requesting inspections, to the State Board and Superintendents not be construed to preclude inspections by the Fire Marshal. The legislative debate on the 1975 amendment focused on the right to inspect without prior request and to make binding findings after such inspection. In both the House and Senate debates, explanations of the bill focused upon this aspect and several legislators indicated that there was no intent to change or affect the Life Safety Code and its applicability to school buildings. Even apart from such legislative history, which always is of limited value, it is to be noted that section 3 — 14.22 is a provision of the School Code addressing the duties of the Board and State Superintendent to request inspections. This context of the provision, as well as its specific focus upon inspections, argues against our construing it as a definitive and explicit statement on the duties and the authority of the Fire Marshal relating to school buildings. We would also note, in passing, that the subparagraph of section 9 of “An Act relating to the investigation and prevention of fire,” which sets forth the authority of the Fire Marshal and his deputies to make inspections, being the fourth paragraph, envisages two distinct situations: (1) where “such dangerous condition or fire hazard is found to exist contrary to the rules herein referred to,” and (2) where “a dangerous condition or fire hazard is found to exist as specified in the first paragraph of this Section, and the rules herein referred to are not applicable to such dangerous condition or fire hazard.” (Ill. Rev. Stat. 1981, ch. 127½, par. 9.) Thus, section 9 itself acknowledges, without specifying, that there may be circumstances wherein the Fire Marshal’s rules and regulations do not apply. Considering the context of section 3 — 14.22, as well as the specific language used therein and the language- in the pertinent part of section 9 of “An Act relating to the investigation and prevention of fire,” the issue of which set of applicable rules and regulations the Fire Marshal is to enforce remains open and unanswered by the legislature. There is an ambiguity under these provisions concerning the standards to be applied by the Fire Marshal in making his inspections and findings.
 

 Additionally, there are two sets of standards, different and in some respects conflicting, which apply to school buildings and which were promulgated under legislative direction and enactment. These are the Life Safety Code standards, from the Board of Education, and the Grey Book standards, from the Fire Marshal. The Life Safety Code is directed to school buildings, covering all aspects of their construction and design, including fire safety. This Code, by legislative direction, is prepared with the advice of the Fire Marshal. (Ill. Rev. Stat. 1981, ch. 122, par. 2 — 3.12.) The Fire Marshal’s Grey Book, on the other hand, has general applicability, respecting fire safety, to all buildings within the State of Illinois. (Ill. Rev. Stat. 1981, ch. 127½, par. 9.) The statutory provisions respecting promulgation of the rules and requirements for school buildings are more specifically and narrowly focused than those respecting promulgation of the Grey Book. Further, even in the area of fire safety requirements, as the trial court found, the provisions of the Life Safety Code are more specific and extensive than the requirements of the Grey Book. Under accepted and established rules for statutory construction (Board of Education v. City of West Chicago (1965), 55 Ill. App. 2d 401, 404, 205 N.E.2d 63), the more specific provisions prevail over the more general ones, in cases of conflict.
 

 Our conclusion herein takes into consideration that special circumstances and factors pertain to the design and construction of school buildings, which do not pertain to all buildings within the State. Nor does our conclusion deprive the Fire Marshal of his authority and duty to ensure the safety of school buildings. Under section 3 — 14.22 of the School Code, he has the authority and duty to make inspections and issue binding findings. While the standards he is to apply are to be based upon the provisions of the Life Safety Code, in the first analysis, he also has authority, under section 9, to order changes if he finds that dangerous conditions or fire hazards exist within a school building. The legislature clearly meant to have the enforcement of fire standards to lie with the State Fire Marshal, as well as with the school boards and the Superintendent. We do not find, however, in the legislative enactments a clear intention to have the Grey Book take precedence over the Life Safety Code as to standards to be applied to school buildings. Such a construction of the statutory provisions would have a potentially devastating statewide effect on our already financially troubled school districts. Since 1965, schools have been constructed based upon the accepted minimum standards for fire safety set forth in the Life Safety Code. As noted previously, the Fire Marshal is directed to give his advice respecting the Life Safety Code’s requirements, and this was done. Further, this school building was approved by the Fire Marshal in 1970, at the time of construction. There is, in some sense, an incongruity and unfairness, absent clear legislative direction, to permit the Fire Marshal to cite the Board for violations of minimum standards for fire safety where he has previously concurred that the school building satisfied minimum standards for fire safety. Further, we note that the differences between the codes, as pertains hereto, is over matters and issues of policy and necessity on which experts can reasonably disagree. There is no serious contention that the requirements of the Life Safety Code are insufficient and leave school children in danger as a result of fire hazards.
 

 If the legislature intended that the Grey Book was to be the standard for enforcement to govern school buildings in this State, then they should have clearly evidenced that intention. Their pronunciations to date have not done so, and given consideration of the practical and equitable factors involved, as well as the established and accepted rules of statutory construction, we conclude that the trial court did not err in its judgment.
 

 For the reasons stated, the judgment of the circuit court of Grundy County in this matter is affirmed.
 

 Affirmed.
 

 BARRY and HEIPLE, JJ., concur.