# Illinois Official Reports

## Appellate Court

---

### *Gurba v. Community High School District No. 155*,
### 2014 IL App (2d) 140098

---

| | |
|---|---|
| Appellate Court Caption | JEFF GURBA, THE LOUIS A. BIANCHI REVOCABLE TRUST, and THE JEAN M. BIANCHI REVOCABLE TRUST, Plaintiffs-Appellees, v. COMMUNITY HIGH SCHOOL DISTRICT No. 155, Defendant (The Board of Education of Community High School District No. 155, Defendant and Third-Party Plaintiff-Appellant; The City of Crystal Lake, Third-Party Defendant-Appellee; and Leslie Schermerhorn, in Her Official Capacity as McHenry County Regional Superintendent of Schools, Third-Party Defendant-Appellant). |
| District & No. | Second District<br>Docket No. 2-14-0098 |
| Filed | September 3, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's holding that defendant school district must comply with the zoning ordinances of the city in which the district was situated when the district reconstructed the bleachers at its athletic field was affirmed, notwithstanding the district's contentions that the trial court's decision was an unconstitutional infringement on the powers of the district's school board and the regional superintendent of schools, since land-use decisions have traditionally been left to local municipalities, not school districts, and local school boards and school districts have traditionally been held subject to the zoning regulations of local municipalities. |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 13-CH-1319; the Hon. Michael J. Chmiel, Judge, presiding. |

| Judgment | Affirmed. |
|---|---|

| Counsel on Appeal | Michael G. Nerheim, State's Attorney, of Waukegan (Daniel L. Jasica and Carla N. Wyckoff, Assistant State's Attorneys, of counsel), for appellant Leslie Schermerhorn. |
|---|---|
| | Dean W. Krone, Robert E. Swain, Steven M. Richart, and Kerry P. Burnet, all of Hodges, Loizzi, Eisenhammer, Rodick & Kohn, LLP, of Arlington Heights, for other appellants. |
| | Victor P. Filippini, Jr., of Filippini Law Firm, LLP, of Glenview, for appellee City of Crystal Lake. |
| | Michael R. Burney, of Schain, Burney, Banks & Kenny, Ltd., of Chicago, and Thomas R. Burney, of Zanck, Coen, Wright & Saladin, P.C., of Crystal Lake, for other appellees. |
| | Brian D. Day and Roger Huebner, both of Illinois Municipal League, of Springfield, *amicus curiae*. |
| | Laurie A. Reynolds, of University of Illinois College of Law, of Champaign, *amicus curiae*. |

| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion. Presiding Justice Burke and Justice Schostok concurred in the judgment and opinion. |
|---|---|

## OPINION

¶ 1     The plaintiffs here are Jeff Gurba, the Louis A. Bianchi Revocable Trust, and the Jean M. Bianchi Revocable Trust, property owners whose land is adjacent to the Crystal Lake South High School football stadium. The defendants are Community High School District No. 155 (the District), which is responsible for, among other things, the physical plant of Crystal Lake South, and the Board of Education of Community High School District No. 155 (the Board). Plaintiffs objected to the District's decision to build bleachers that violated the zoning and stormwater ordinances of the City of Crystal Lake (the City) by being too big, too high, and too close to the property line. The complaint spawned a third-party action filed by the Board against the City and Leslie Schermerhorn, in her capacity as the McHenry County regional superintendent of schools (the Superintendent). In short, the Board decided to reconstruct and

relate the home bleachers, but it did not notify the City or comply with the City's zoning ordinances, under which the Board would have been required to obtain a variance or special-use permit. The trial court held that the Board was subject to the City's zoning and stormwater ordinances, and the Board appeals, contending that the court's ruling represented an unconstitutional infringement on the Board's and the Superintendent's power. We disagree and affirm.

¶ 2                                   I. BACKGROUND

¶ 3        The District operates several high schools located within both Lake and McHenry Counties. It serves the municipalities of Bull Valley, Burton's Ridge, Cary, Crystal Lake, Fox River Grove, Lake in the Hills, Lakewood, Oakwood Hills, Prairie Grove, and Ridgefield. In particular, the District operates Crystal Lake South, which is located within the City.

¶ 4        The controversy in this case arose from a failed structural inspection of the bleachers and the Board's decision to replace them. As part of the project, the Board decided to switch the home and visiting bleachers, moving the home bleachers to the side of the field that is adjacent to plaintiffs' property. The Board represents that repositioning the bleachers would improve the traffic flow inside the stadium. The Board avers that the bleachers are used for "school purposes[,] such as physical education classes and visitor seating for school events."

¶ 5        The Board submitted its plans for the project to the Superintendent, who reviewed the plans and issued a building permit, pursuant to section 3-14.20 of the Illinois School Code (105 ILCS 5/3-14.20 (West 2012)). The Board did not proceed under the City's zoning code or notify the City. The Board avers that the Superintendent was required to provide notice only if the City requested it and that the City never made that request.

¶ 6        While the bleacher project was underway, the City objected, maintaining that the project required a special-use permit, a stormwater permit, and zoning variances from the City. Under the City's zoning plan, the high school's campus is located in an R-2 (single-family home) district. The City maintained that its zoning restrictions applied to the project and that the home bleachers were limited to a height of 15 feet, a size of 600 square feet, and a minimum setback of 50 feet from the property line. The Board did not agree and did not change the project to comply with the City's zoning restrictions. The City then issued a stop-work order against the Board.

¶ 7        As the City and the Board's controversy was gearing up, plaintiffs sued the District and the Board, seeking to privately enforce the City's zoning and stormwater ordinances. The Board filed a third-party complaint against the City and the Superintendent, seeking a declaration that the project was not subject to the City's zoning or stormwater ordinances.

¶ 8        The parties filed cross-motions for summary judgment. The trial court determined that the project was subject to the City's zoning and stormwater ordinances, and the Board timely appeals.[1]

_____

[1]Plaintiffs' action remains pending in the trial court.

## II. ANALYSIS

On appeal, the Board argues that it is not subject to the City's zoning or stormwater-management ordinances. [2] The Board roots its contention in the Illinois Constitution of 1970. The Board argues that the constitution declares public education to be a matter of statewide concern and that the legislature, acting under a constitutional grant of plenary power over public education, has enacted a comprehensive scheme to regulate the field and has relegated to municipalities only a limited role. Based on this chain of reasoning, the Board contends that the City's zoning power stops at the boundary of property used for school purposes (and it makes the ancillary argument that the "school purposes" test or analysis is well established in the case law and is applicable to the controversy in this case). We follow the Board's general organization in presenting our opinion (constitutional support, statutory support, other considerations), but we do not fully agree with the contours of the Board's argument, so we set forth our analysis of each issue and then consider any particulars of the Board's contentions that have not been addressed in our analysis.

### A. Standard of Review

We begin with the overarching standard of review. This matter comes before us after the trial court ruled on the parties' cross-motions for summary judgment. Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with any affidavits, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2012); *G.M. Sign, Inc. v. State Farm Fire & Casualty Co.*, 2014 IL App (2d) 130593, ¶ 15. When the parties file cross-motions for summary judgment, they agree that no material factual issues exist and that only questions of law are presented. *City of Oakbrook Terrace v. Suburban Bank & Trust Co.*, 364 Ill. App. 3d 506, 510 (2006). (Of course, neither the trial court nor the reviewing court is required to accept the parties' beliefs as to the existence of factual issues, and both courts remain free to determine the existence of a genuine factual issue sufficient to preclude the entry of summary judgment. *Id.*) We review *de novo* the trial court's ruling on a motion for summary judgment. *G.M. Sign*, 2014 IL App (2d) 130593, ¶ 15. Likewise, we review *de novo* the construction of any statutes or ordinances, as it involves legal questions. *Oakbrook Terrace*, 364 Ill. App. 3d at 510.

### B. Constitutional Underpinnings

The Board begins with some of the pertinent language from the Illinois Constitution regarding public education as well as municipalities' home-rule powers. As this is a good starting point, we will begin our analysis similarly. We keep in mind that, when discussing and interpreting a constitutional provision, we wish to discern the common understanding of those who ratified and gave life to the constitution. *Ritzheimer v. Insurance Counselors, Inc.*, 173 Ill. App. 3d 953, 958 (1988). This common understanding is best determined by looking

---

[2]If the City were to prevail on the issue of the zoning ordinances, then the same result would necessarily obtain for the stormwater ordinances. Accordingly, we look to the arguments on the zoning ordinances, keeping in mind that they are fully applicable to the stormwater ordinances also.

at the common meaning of the words used in the provision. *Id.* Moreover, the rules of statutory interpretation are roughly applicable to interpreting a constitutional provision, and we are to strive to interpret a constitutional provision so as to promote its essential purpose. *Id.* With these principles in mind, we turn to the constitution's public education provisions animating this dispute.

¶ 15      The Illinois Constitution contains an article devoted solely to education. Ill. Const. 1970, art. X. In section 1, article X states, "A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities." Ill. Const. 1970, art. X, § 1. To that end, the state government is tasked to "provide for an efficient system of high quality public educational institutions and services." *Id.* The Board points to these provisions, as well as those mandating the state to provide free public education through the secondary-school level and any other free education required by statute. *Id.* In addition to making these hortatory statements and assigning fiscal responsibility, the constitution created and empowered a State Board of Education to oversee the implementation of public education. Ill. Const. 1970, art. X, § 2. Notably, section 2 provides that "[t]he Board, except as limited by law, may establish goals, determine policies, provide for planning and evaluating education programs and recommend financing." Ill. Const. 1970, art. X, § 2(a).

¶ 16      In addition to the article devoted to education, we note (although the Board did not) that, in article VII, the constitution explains the powers of local governments, including local school boards. Specifically, it states that "[t]ownships, school districts, special districts and units, designated by law as units of local government, which exercise limited governmental powers or power in respect to limited governmental subjects shall have only powers granted by law." Ill. Const. 1970, art. VII, § 8. Additionally, the constitution differentiates between municipalities and other, limited, local governmental units: " 'Municipalities' means cities, villages and incorporated towns. 'Units of local government' means counties, municipalities, townships, special districts, and units, designated as units of local government by law, which exercise limited governmental powers or powers in respect to limited governmental subjects, but does not include school districts." Ill. Const. 1970, art. VII, § 1; see also *Bremen Community High School District No. 228 v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112177, ¶ 26 (noting that the Illinois Constitution expressly differentiates school districts from municipalities).

¶ 17      Keeping in mind that the Board attempts to characterize the issue in this case as a contest between the powers of the District and the home-rule authority of the City, we note that the constitution expressly addresses the power of home-rule units in section 6 of article VII. Ill. Const. 1970, art. VII, § 6. The constitution first defines a home-rule unit, then it expressly empowers home-rule units:

> "Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a).

The constitution also expressly grants the home-rule municipality primacy within its corporate boundaries, at least with respect to other home-rule units: "If a home rule county ordinance conflicts with an ordinance of a municipality, the municipal ordinance shall prevail within its jurisdiction." Ill. Const. 1970, art. VII, § 6(c). But while home-rule units are granted broad autonomy under section 6 of article VII, the state may still preempt and occupy

a field of the law: "The General Assembly may provide specifically by law for the exclusive exercise by the State of any power or function of a home rule unit ***." Ill. Const. 1970, art. VII, § 6(h). Even so, home-rule units may still "exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." Ill. Const. 1970, art. VII, § 6(i). In keeping with the broad powers of home-rule units, the constitution forbids the legislature from interfering with home-rule units' ability to impose certain taxes and special assessments regarding local improvements and special services. Ill. Const. 1970, art. VII, § 6(l). Finally, the constitution mandates that the "[p]owers and functions of home rule units shall be construed liberally." Ill. Const. 1970, art. VII, § 6(m).

¶ 18    Looking at the various constitutional provisions quoted and paraphrased (as well as all of the remaining provisions) dealing with education, school districts, and home-rule units and their powers, we first conclude that the language is sufficiently clear for our interpretive purposes (while keeping in mind the old saw that the devil is often in the details). See *McFatridge v. Madigan*, 2013 IL 113676, ¶ 18 (in attempting to implement the drafters' intent, where the language is clear and unambiguous, the court must apply it as written, without resort to outside sources or interpretive tools).

¶ 19    The powers of home-rule units and school districts are matters of constitutional dimension, and the strong public policy statement concerning public education suggests that school districts' powers are as important as the powers of home-rule units. There are, however, several provisions that suggest that, in the case of a conflict between a home-rule unit and a school district, there is a slight bias toward the home-rule unit. The first suggestion is the broad and liberal grant of powers to home-rule units. Section 6(a) of article VII grants a home-rule unit powers over its government and affairs, including the power to issue laws to further the public health, safety, morals, and welfare. Of course, the power granted is not limitless; it is limited to the home-rule unit's government and affairs. But the home-rule unit is allowed to exercise its powers concurrently with the state, unless the legislature expressly preempts them, and the powers and functions of the home-rule unit are to be liberally construed. Ill. Const. 1970, art. VII, § 6. Perhaps most importantly for our analysis here, home-rule-unit primacy is embodied in the express language of the constitution, which guarantees that, if a county-level home-rule unit's ordinances conflict with those of a municipality-level home-rule unit, the municipality's ordinances will be given effect in the municipality's territory or jurisdiction. Ill. Const. 1970, art. VII, § 6(c). This primacy suggests a slight bias in favor of a local, or narrower, unit over a regional, or broader, unit.

¶ 20    On the other hand, the constitution is careful to emphasize the limited authority of school districts. Unlike a home-rule unit, the powers of which are subject only to an express preemption by the legislature, a school district's powers are only those bestowed by the legislature. Ill. Const. 1970, art. VII, § 8. Again, comparing a school district's powers, which are derived statutorily and may not extend beyond the statutory mandates, with a home-rule unit's powers, which derive from the constitution and extend throughout its bailiwick unless expressly statutorily limited, suggests that, in a conflict between a school district and a home-rule unit, the home-rule unit's powers should be given precedence.

¶ 21    This principle is further strengthened by the express constitutional recognition that a school district is by definition not a municipality. Ill. Const. 1970, art. VII, § 1. In fact, rather

- 6 -

than exalting a school district to a position equal to or greater than that of a municipality, it relegates a school district to the somewhat lesser status of a quasi-municipality, acting for the state as its administrative arm overseeing the establishment and implementation of free schools. See *Bremen Community*, 2012 IL App (1st) 112177, ¶ 24 (as a quasi-municipality, the school district possesses a degree of power similar to that of a municipality but lacks the scope of political and legislative authority).

¶ 22    The constitution's treatment of public education does not raise the priority and powers of its institutions above those of home-rule units. First, the article dealing with public education combines aspirational exhortations with assignments of fiscal responsibility for a very broadly and generally outlined educational system. Ill. Const. 1970, art. X, § 1. The constitution also provides for the creation of the State Board of Education and empowers it to set goals and policies, plan and evaluate education programs, and recommend financing (Ill. Const. 1970, art. X, § 2)–none of which have anything to do with land use and whether a school board or district is subject to the local municipality's zoning regulations.

¶ 23    After analyzing the plain language of the various constitutional provisions relating to school districts, public education, and home-rule units, we conclude that there is clear support for the trial court's determination that the Board was subject to the City's zoning ordinances. This conclusion based on the constitutional language is certainly not dispositive–there is more authority to examine. Further, the constitutional language favors the City to only a small degree; while we discern a trend that seems to favor the powers of a home-rule unit over those of a local board of education or school district, the constitutional provisions are (necessarily) both broad and general, and this diminishes the weight to be accorded them in this specific controversy.

¶ 24    We turn now to the Board's contentions regarding the import of the constitutional language. We first note that the Board does not undertake to consider all of the various constitutional provisions regarding school districts, public education, and home-rule units and their powers. Instead, the Board first selects language only from subsection 6(a) of article X. Specifically, the Board highlights the "pertaining to its government and affairs" language of section 6(a) (Ill. Const. 1970, art. X, § 6(a)) and notes that it is a limitation on a home-rule unit's powers. See *Ampersand, Inc. v. Finley*, 61 Ill. 2d 537, 540 (1975) (counsel to the constitutional convention's local government committee suggested that the question regarding the " 'pertaining to its government and affairs' " language was not whether it limited the grant of home-rule powers but, rather, how extensive the limitation should be). In fact, home-rule units' powers are related to the specific problems facing home-rule units, and they do not extend to matters of statewide (or nationwide) concern, such as divorce, real property, trusts, contracts, and the like, which are matters generally recognized to fall within the competence of the state rather than local authorities. *Id.*

¶ 25    We do not (and cannot) disagree with the notion that the "pertaining to" language is a limitation or that the question is how much the "pertaining to" language limits a municipality's home-rule powers. With that said, we note further that the Board effectively ignores other important language in section 6, such as subsection 6(i), which authorizes home-rule units to exercise their authority concurrently with the state (in matters "pertaining to [their] government and affairs") unless expressly preempted by the legislature. Ill. Const. 1970, art. VII, § 6(i). Likewise, the Board ignores subsection 6(m), mandating the liberal construction of the "[p]owers and functions of home rule units." Ill. Const. 1970, art. VII,

§ 6(m). Thus, while we are critical of some of the details of the Board's initial constitutional arguments, we accept the larger point that home-rule units' powers are circumscribed in various ways and that their circumscription is of constitutional dimension.

¶ 26 The Board shifts from the concept of limited home rule to the constitution's language on public education. The idea animating the Board's argument is that home-rule powers must give way to matters of statewide concern. The Board constructs its argument by positing first that public education is a matter of statewide concern and next that the legislature is given plenary power over public education. Finally, the Board concludes that, therefore, home-rule powers must be subordinate to anything that touches on public education.

¶ 27 The Board first asserts that the constitution declares public education to be a matter of statewide concern. We agree with the Board's assertion. The constitution states, "A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities." Ill. Const. 1970, art. X, § 1. In order to fulfill this fundamental goal, the constitution requires the state to "provide for an efficient system of high quality public educational institutions and services," and it then parcels out various fiscal responsibilities necessary to construct and maintain a comprehensive system of public education through the primary and secondary levels. *Id.* These provisions, along with the establishment of a State Board of Education (Ill. Const. 1970, art. X, § 2), evince the intent to make public education a matter of statewide concern.

¶ 28 We note that the Board offers a number of quotes from the committee on education in the record of proceedings of the constitutional convention. 6 Record of Proceedings, Sixth Illinois Constitutional Convention 223-334 (hereinafter, Proceedings). In particular, the Board excerpts a number of comments from the committee's explanation of its proposals concerning section 1 of article X, all of which underscore the importance of education and the state's fundamental interest in a high-quality educational system. See 6 Proceedings 231-37. We need not further discuss the Board's foray into the Proceedings, as we agree with the Board that public education involves matters of statewide concern.

¶ 29 We do note, however, that there remains a difference between the abstract concept of public education set forth in the constitution, which is of statewide interest, and an individual school district or local board of education, which, while on the front line of implementing public education, remains rooted in the local community. In other words, it is difficult to see what an individual school district or local board of education could do (assuming no impropriety) that would be of statewide concern beyond the abstract idea of providing a venue for public education.

¶ 30 The second proposition of the Board's public-education-is-paramount syllogism is that our supreme court has held that the Illinois Constitution grants the legislature plenary power over public education. Again, this proposition is correct. In *Board of Education of School District No. 150 v. City of Peoria*, 76 Ill. 2d 469, 476 (1979), as quoted by the Board, our supreme court concluded that "the legislature, pursuant to the constitutional mandate, exercises plenary power over the Illinois school system." In the very next sentence, however, the supreme court expressly sidestepped the issue here: "We need not decide whether health and safety ordinances of home rule cities are enforceable against school districts." *Id.* (The Board, however, characterizes that sentence as expressing "deference to [the] plenary power" bestowed on the legislature over public education. We do not necessarily agree, especially since the first quoted sentence relates to the Illinois school system as a whole, and the second

quoted sentence deals with local school districts, so the object of each sentence is distinctly different.)

¶ 31    The Board's reliance on *Peoria* is misplaced. While *Peoria* does, in fact, make several statements about the legislature's plenary power over public education (*id.* at 475-76), it does not fully articulate what that plenary power means, especially in a case like this, involving the City's zoning ordinances and their impact on the Board. For instance, the Board argues that, "[i]n deference to [the legislature's] plenary power, the [Illinois] Supreme Court would not even assume that 'health and safety ordinances of home rule cities are enforceable against school districts,' and instead left that issue undecided" (quoting *id.* at 476). What actually happened in *Peoria*, however, was that the court considered the propriety of a local tax ordinance that both imposed extra duties on and gave greater powers to the local school board than were imposed or given in the School Code. *Id.* at 476-77. Because the court was considering a tax ordinance, it declared that it "need not decide whether health and safety ordinances of home rule cities are enforceable against school districts." *Id.* at 476. The difference between what the Board is saying in its argument and what the court actually said is subtle, but important. The Board attempts to base the court's statement on its deference to the legislature's plenary power over public education. This is a strained and misleading interpretation. The more natural and less tortured reading of the court's statement is that the case simply did not involve health and safety ordinances, but involved only a tax ordinance, so any foray into the consideration of health and safety ordinances would be unwarranted. Thus, while properly noting that the court acknowledged the legislature's plenary power over public education, the Board engages in over-interpretation and attempts to add reasoning that is simply not supported by the text of the decision. Accordingly, we reject the Board's interpretation of *Peoria*, while noting what *Peoria* properly holds.

¶ 32    We note that zoning provisions have long been held to be appropriate exercises of a home-rule unit's power to regulate for the protection of public health, safety, morals, and welfare. *E.g.*, *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 310-11, 315 (2008) (recognizing that the connection between zoning and regulating for the protection of public health, safety, morals, and welfare was first enunciated in *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926), and holding that the validity of a zoning ordinance requires that it be substantially related to the promotion of public health, safety, morals, and welfare); *La Salle National Bank of Chicago v. County of Cook*, 12 Ill. 2d 40, 46-47 (1957) (a zoning ordinance is valid if it bears a substantial relationship to promoting the public health, safety, morals, and welfare); *LeCompte v. Zoning Board of Appeals*, 2011 IL App (1st) 100423, ¶ 19 (a village is a home-rule unit and may exercise, among other things, the power to regulate for the protection of public health, safety, morals, and welfare, and so the village is empowered by the Illinois Constitution to enact a zoning code); *Village of Tinley Park v. Ray*, 299 Ill. App. 3d 177, 178-79 (1998) (the Illinois Constitution empowers a home-rule unit to enact zoning regulations in order to advance public health, safety, morals, and welfare). Despite the manifold cases approving of a home-rule unit's power to enact zoning regulations, our supreme court, as noted, expressly declined to address the issue of whether a home-rule unit's zoning ordinances would be enforceable against a local school district. *Peoria*, 76 Ill. 2d at 476. We further note that neither the parties' nor our own research has uncovered any cases purporting to settle the issue. The upshot is that the question of whether a home-rule

unit's zoning ordinances are enforceable against a school district or local board of education is undecided.

¶ 33        Next, to reinforce its already accepted point that public education is a matter of statewide concern, the Board cites *McLorn v. City of East St. Louis*, 105 Ill. App. 3d 148, 153 (1982), for the proposition that, when a constitutional provision commits an area of interest to a specific branch of government, this indicates that the area is one of statewide concern. In *McLorn*, the area of interest was sovereign immunity, which the constitution committed to the legislature. Thus, when the municipality passed an ordinance effectively giving it sovereign immunity against a judgment the municipality incurred, the court held that it trespassed into a matter of statewide concern and that its ordinance was invalid. *Id.* at 154. The Board's unstated conclusion (and the conclusion to its syllogism) is that, because public education is a matter of statewide concern, the City's zoning ordinances cannot be effective against institutions implementing public education, namely, the Board and the District. We disagree. The City's zoning ordinances regulate land use within the City's boundaries. They do not speak to the topic of public education or otherwise seek to intrude into the realm of public education. Thus, *McLorn* offers little insight on the issues in controversy in this case, other than to suggest that public education, like sovereign immunity, is properly regarded as a matter of statewide concern.

¶ 34        In similar fashion, the Board cites *Oakbrook Terrace*, 364 Ill. App. 3d at 514, for the same proposition as *McLorn*. Again, the Board has accurately cited the case, but, once again, the point is of little moment. We acknowledge that statewide concern may be demonstrated for an area where the constitution commits that area to a specific branch of the government. Even conceding this point, however, there remains the issue of how land-use regulations impinge on the area of public education.

¶ 35        The Board has established the first two propositions of its syllogism: that public education is a matter of statewide concern and that the legislature has plenary power over public education. The Board's conclusion, that a home-rule unit may not interfere with the land use of a school district, however, does not follow from the propositions the Board has established. Instead, a better conclusion, and one actually supported by the authority cited by the Board, would be that a home-rule unit may not enact ordinances that infringe upon the realm of public education, such as by changing local graduation requirements or some other action that would affect the content or substance of the public education being offered in the locality. Instead of keeping public education as the object in the conclusion to the syllogism, the Board changes it to school district, as if "school district" were a complete synonym for "public education." First, the Board offers no support that "school district" and "public education" are synonymous and interchangeable. Second, land-use regulations have no inherent impact upon the substance of public education. Accordingly, we reject the Board's arguments underpinning its constitutional analysis of the issue.

¶ 36                              C. Statutory Underpinnings
¶ 37        The Board next asserts that the School Code trumps the City's zoning ordinances. Accordingly, we look to various provisions of the School Code. After completing our analysis of the School Code, we will then address any pertinent arguments that have not yet been addressed, as needed.

¶ 38    As a preliminary matter, having alluded to them in the previous section, we review the principles of statutory interpretation. The cardinal principle of statutory interpretation is to ascertain and give effect to the intent of the legislature in enacting the statute. *Krautsack v. Anderson*, 223 Ill. 2d 541, 552-53 (2006). The best indication of the legislature's intent is the actual language used in the provision, which is given its plain and ordinary meaning. *Id.* at 553. In considering a statute, the court must give effect to the entire statutory scheme; the words and phrases of the statute must not be viewed in isolation; rather, they must be interpreted in light of other relevant portions of the statute. *Id.* The questions presented by statutory interpretation are issues of law, which are reviewed *de novo*. *Id.* With these principles in mind, we turn to the School Code.

¶ 39    The School Code is largely devoid of any references to zoning. One provision, and one provision only, in the School Code expressly refers to zoning: "To seek zoning changes, variations, or special uses for property held or controlled by the school district." 105 ILCS 5/10-22.13a (West 2012) (Zoning Change Provision). We cannot say whether the Zoning Change Provision is unambiguous, because, standing alone, there is no context. Accordingly, we refer to the rest of the section within which it resides to provide context for this express reference to zoning. Article 10 of the School Code deals with school boards—their creation, composition, duties, and responsibilities, including sections on financing, providing education for students, and administering individual schools. 105 ILCS 5/10-1 *et seq.* (West 2012). Among the various enumerated powers and duties is the Zoning Change Provision (105 ILCS 5/10-22.13a (West 2012)).

¶ 40    We see, then, that the proper context for the Zoning Change Provision relates to school boards and, particularly, to the duties and powers of the local school board. Thus, it is the local school board that is empowered and required "[t]o seek zoning changes, variations, or special uses for property held or controlled by the school district." 105 ILCS 5/10-22.13a (West 2012). From this, we draw the conclusion that the local school board must obey and avail itself of the local municipality's zoning regulations in order "[t]o seek zoning changes, variations, or special uses" for school property residing in that municipality.

¶ 41    Having considered the statute as a whole, we note two more canons of construction that appear to be apt in construing the Zoning Change Provision: the first requires that no term or phrase be rendered meaningless or superfluous. *Stevens v. Village of Oak Brook*, 2013 IL App (2d) 120456, ¶ 34 (a court must interpret a statute in a way that avoids making any portion of the statute meaningless or superfluous). Applying this canon to the Zoning Change Provision suggests that, if, as the Board argues, the Board is never subject to local zoning provisions, the Zoning Change Provision is wholly unnecessary and superfluous because the Board would never have to seek a zoning change, variance, or special use.

¶ 42    The Attorney General recently relied on the superfluity canon in an opinion as to whether public school districts were subject to county or municipal zoning ordinances. 2011 Ill. Att'y Gen. Op. No. 11-005. The Attorney General concluded that, generally, a local public school district was subject to municipal or county zoning ordinances, unless compliance with the ordinances would frustrate the district's ability to provide public education. *Id.* at 1. We find the Attorney General's analysis to be informative.

¶ 43    The Attorney General first reviewed the provenance of zoning ordinances in both home-rule units and non-home-rule units. Pertinently, in the case of home-rule units, their zoning power is derived from article VII, section 6, of the Illinois Constitution of 1970 (Ill.

- 11 -

Const. 1970, art. VII, § 6). 2011 Ill. Att'y Gen. Op. No. 11-005, at 2. The Attorney General also noted that courts have long held that zoning ordinances are valid exercises of home-rule authority. *Id.* Further, there are no statutory provisions that limit a home-rule unit's exercise of its zoning authority regarding school districts. *Id.*

¶ 44        The Attorney General next reviewed the School Code. She reasoned:

"Under the plain and unambiguous language of [the Zoning Change Provision], school boards are expressly authorized to 'seek zoning changes, variations, or special uses for property held or controlled by the school district.' This express grant of authority to seek zoning changes, variations, and special uses would be unnecessary if school property was not subject to local zoning ordinances in the first instance. To conclude otherwise would render [the Zoning Change Provision] completely superfluous." *Id.* at 3.

The Attorney General also considered that, in the relevant statutes, there is nothing exempting local school boards or school districts from compliance with local zoning regulations, while section 10-20 of the School Code (105 ILCS 5/10-20 (West 2010)) subjects the local school board to those duties imposed upon it by other statutory or constitutional provisions. 2011 Ill. Att'y Gen. Op. No. 11-005, at 3. From this, the Attorney General concluded that, generally, a school district is subject to local zoning regulations. *Id.*

¶ 45        The Attorney General then considered what might happen if compliance with the local zoning regime frustrates the school district's ability to fulfill its statutory duties regarding the provision of public education. She concluded that this was a factual issue beyond her power to answer, but that the school district could seek judicial relief. *Id.* at 5.

¶ 46        Obviously, the Attorney General's opinion is not binding or precedential; we do, however, find its reasoning to be persuasive. The Attorney General reviewed, as we did, relevant constitutional and statutory provisions in determining that a school district is generally subject to the zoning regulations of the municipality in which it resides. Specifically, she relied on a construction of the Zoning Change Provision that did not render it superfluous or unnecessary. *Id.* at 3; see also *supra* ¶ 40. The concern that the Board or the District will be frustrated in performing its statutory duties is not present on the facts before us, and this concern has not been raised in this case. Accordingly, we find that the Attorney General's opinion provides strong support for our analysis and the City's position.

¶ 47        Further, in light of the superfluity canon of construction and the Attorney General's opinion, we are unable to see why, if a local school board or school district were deemed to have unfettered discretion and power regarding the placement, size, and height of structures on its property, the board or district would need to seek a zoning change, variance, or special use. Because, under the Board's view, the local school board or school district can do whatever it pleases on its property, it need not obey any local zoning regulations that would restrict the placement, size, or height of a structure on school property, so it need not avail itself of the Zoning Change Provision's grant of the power to seek a zoning change, variance, or special use. Thus, the Board's view makes the Zoning Change Provision entirely surplusage. By contrast, interpreting the Zoning Change Provision as subjecting the local school board and school district to the municipality's zoning regulations gives effect to the provision. If the board and the district are subject to the municipality's zoning regulations, then the Zoning Change Provision's grant of authority to seek zoning changes, variances, and special uses becomes essential should the board or the district wish to change the placement,

size, or height of a structure on its property. Accordingly, we hold that the Board is subject to the City's zoning ordinances.

¶ 48     The Board specifically objects to our application of the superfluity canon of construction. We note, however, that the Board does not assail the canon itself; rather, the Board posits a different construction of the Zoning Change Provision, under which it is not superfluous. Specifically, the Board argues that, to properly interpret the Zoning Change Provision, we must consider section 2-3.12(c) of the School Code (105 ILCS 5/2-3.12(c) (West 2012)). Section 2-3.12(c) authorizes the creation of the " 'Health/Life Safety Code for Public Schools' " (Health/Life Safety Code). *Id.* Section 2-3.12(c) also acknowledges that a school district may own property that is not used for school purposes: "Facilities owned by a school district but that are not used to house public school students or are not used for public school purposes shall be governed by separate provisions within the code [(*i.e.*, the Health/Life Safety Code)] authorized by this Section." *Id.* The Board argues that the dichotomy between property used for public school purposes and property not used for public school purposes is inherent within the Zoning Change Provision, which applies only to that property which is not used for public school purposes. If read with this understanding, then even under the superfluity canon, the Zoning Change Provision is not rendered meaningless, because section 2-3.12(c) excludes from the ambit of the Health/Life Safety Code property not used for public school purposes and, for such property, the local school board will need to seek zoning changes, variances, and special uses. We disagree with the contention.

¶ 49     When interpreting a statute, we cannot read a provision in a fashion that makes it meaningless or superfluous, but, if at all possible (*Stevens*, 2013 IL App (2d) 120456, ¶ 34), we also cannot depart from the statute's plain language and read into it exceptions, limitations, or conditions that conflict with or differ from the legislative intent (*Village of Lake in the Hills v. Niklaus*, 2014 IL App (2d) 130654, ¶ 15). The Zoning Change Provision empowers a local school board "[t]o seek zoning changes, variations, or special uses for *property held or controlled by the school district*." (Emphasis added.) 105 ILCS 5/10-22.13a (West 2012). In that provision, "property" is not modified, as in section 2-3.12(c), with words such as "used to house public school students" or "used for public school purposes" (105 ILCS 5/2-3.12(c) (West 2012)); rather, "property" is modified by "held or controlled by the school district" (105 ILCS 5/10-22.13a (West 2012)).[3] The phrase modifying "property" in the Zoning Change Provision suggests that *all* school property–owned or rented or otherwise controlled by the district, whether it is or is not used for school purposes–is subject to the Zoning Change Provision. If the legislature had intended to limit the term "property" in the Zoning Change Provision to anything less than all, it was well capable of doing so, as evidenced by the restriction placed on "facilities" in section 2-3.12(c). See also, *e.g.*, *People v. Bywater*, 223 Ill. 2d 477, 484 (2006) (the legislature is capable of adding appropriate modifying language to a statute to accomplish the intended end, such as an event triggering the running of a time period).

¶ 50     Moreover, the Health/Life Safety Code itself does not deal with zoning considerations; rather, it is concerned primarily with the construction and maintenance of facilities associated with schools. See, *e.g.*, 23 Ill. Adm. Code 180.30 (2007) (" 'Facility' means land, buildings,

---

[3]Indeed, in section 2-3.12(c), "property" is not used in the sentence under consideration; "facilities" is the term used, and "facilities" is a narrower word than "property."

- 13 -

structures and improvements other than buildings, and permanent, fixed equipment attached to or incorporated in any building owned or used for school purposes by a school district subject to this Part. This definition excludes facilities owned by a school district but not used for public school purposes, which shall be subject to *local building codes*." (Emphasis added.); "variance" pertains not to zoning but to the various building, property maintenance, and fire codes and the like specified in section 180.60); *Board of Education of Minooka Community High School District No. 111 v. Carter*, 119 Ill. App. 3d 857, 861 (1983) (the Health/Life Safety Code "is directed to school buildings, covering all aspects of their construction and design"). Thus, "property," as used in the Zoning Change Provision, refers to all of a school district's property, and not only to property not used for public school purposes, as proposed by the Board. The plain language of the provision contains no such limitation, and no such limitation is necessary for a reasonable interpretation of the Zoning Change Provision. *Sycamore Community Unit School District No. 427 v. Illinois Property Tax Appeal Board*, 2014 IL App (2d) 130055, ¶ 28 (a court should not interpret a statute in a manner leading to an absurd or unjust result). In contrast, the Board's reading of the Zoning Change Provision, while not resulting in absurdity, incorporates into the provision limitations that simply were not written by the legislature. Accordingly, we reject the Board's specific argument on this point.

¶ 51     The other canon of construction that appears to be apt in the circumstances of this case is the maxim of *expressio unius est exclusio alterius*, or the inclusion of one is the exclusion of the other. *In re Marriage of Hendry*, 409 Ill. App. 3d 1012, 1018 (2011). The Zoning Change Provision appears in a lengthy enumeration of the various powers a local school board may exercise in discharging its responsibility to maintain, operate, and develop all of the schools under its jurisdiction. See 105 ILCS 5/10-20 to 10-23.13 (West 2012). Being given the express power "[t]o seek zoning changes, variations, or special uses for property held or controlled by the school district" (105 ILCS 5/10-22.13a (West 2012)) suggests that the local school board must apply for a zoning change, variance, or special use rather than exercise zoning powers itself. In other words, under the *expressio unius* maxim, because the local school board may seek a zoning change, it may not effect zoning regulations or changes on its own. Thus, the *expressio unius* maxim suggests that the Board is subject to the City's zoning ordinances rather than immune from them.[4] Accordingly, we hold that, under section 10-22.13a of the School Code, the Board must follow the requirements of the City's zoning ordinances.

¶ 52     The Board reviews several individual provisions of the School Code. Many of the arguments associated with them are insubstantial, so we will address only those arguments we deem strongest. The Board focuses on section 10-22.1 *et seq.* of the School Code (105 ILCS 5/10-22.1 *et seq.* (West 2012)), which set forth a local school board's specific powers and duties over school property. The Board seeks to make an *ejusdem-generis-* (enumeration of a list requires that any other unenumerated things be of similar character (see *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 492 (2009))) or *expressio-unius*-type contention regarding these sections. Most of the specific subsections highlighted by the Board do not really support its contention; however, sections 10-22.35A and 10-22.36 (105

_____

[4]The Board does not make an argument specifically considering or challenging the *expressio unius* maxim.

ILCS 5/10-22.35A, 10-22.36 (West 2012)) cannot be easily dismissed. In section 10-22.35A, the local school board is empowered to purchase property and buildings for schools and to condemn land for schools, if necessary. We believe that this section fairly supports the Board's position, because the purchase of property (or condemnation of land) for school use seems to involve issues of land use, namely, whether a particular use is allowed in a particular location in the municipality. However, the Board's contention is undermined by noting that the Zoning Change Provision allows and requires the local school board to avail itself of the necessary procedures to effect a zoning change, variance, or special use as necessary when property slated for school use is purchased or is obtained through condemnation. Likewise, section 10-22.36 empowers the local school board to construct school buildings. This section, too, would seem to involve issues of land use, namely the dimensions and locations of buildings on the property. Once again, however, the contention is defeated by the Zoning Change Provision.

¶ 53     As a side note, the Board's statutory arguments suppose that the Health/Life Safety Code controls all aspects of the construction of school structures, including those matters typically falling under the aegis of zoning. However, the Health/Life Safety Code is, essentially, a building code specifying the standards for the construction and maintenance of structures to be used by the local school board and school district in fulfilling their duties to provide public education to their students. We do not notice any provisions in the Health/Life Safety Code that deal with land use or zoning; the Board similarly does not point to any such provisions. Thus, the Board makes its statutory arguments with the unstated and faulty assumption that the Health/Life Safety Code covers zoning-type issues. We reject this assumption as unfounded and consider the Board's characterization of the provisions of the School Code without it.

¶ 54     The Board argues that section 10-22.31b of the School Code (105 ILCS 5/10-22.31b (West 2012)) illustrates the principle that, if the legislature wanted to allow local governments to have coordinate responsibilities over school facilities, it was able to do this expressly. The conclusion implied is, of course, that the absence of an express assignment to local municipalities of zoning oversight or responsibilities means an intent to allow the local school board and school district to exercise exclusive authority over land use and zoning-type issues. We acknowledge that this is a pretty good argument. Section 10-22.31b makes the maintenance of residential facilities subject to applicable local and state health, licensing, and life-safety requirements, as well as to the Health/Life Safety Code.[5] This argument fails because there is no support for the idea that the school board or school district was granted any authority over issues of land use, zoning, or zoning-type issues in the municipality

_____

[5]The reference to section 10-22.31b is actually in the nature of a throwaway line. The Board seeks to make this point by referring to the authorizing provisions within section 2-3.12 of the School Code (105 ILCS 5/2-3.12 (West 2012)), requiring the State Board of Education to create the Health/Life Safety Code with input from the Department of Public Health and the State Fire Marshal, as well as giving the State Fire Marshal authority to conduct fire-safety inspections of school facilities. This aspect of the argument is weak because the statute does not give local governments any powers concurrent with or over the local school board and school district; rather, it allows state agencies input on drafting a building code and grants a state agency the responsibility to conduct a singular and specialized investigation, which would appear to be beyond the expected competence levels of the board and the district.

containing the school facilities. If, for instance, there were a number of provisions that created concurrent interests in a zoning issue, the Board's argument would be much weightier and more difficult to reject. However, the Board cites to only a single provision giving such an interest to local governments, and this is simply not enough to establish the point, especially given the lack of any express provisions according boards and districts the power to determine land use and zoning for school property. Accordingly, while we acknowledge that the Board's argument is not bad, we remain unpersuaded.

¶ 55     The Board also seeks to convince us that the "for-school-purposes" test is a game changer. The Board zeroes in on the underpinnings of and authority employing the for-school-purposes test in an attempt to convince us that the Zoning Change Provision really refers to property and facilities *not* used for school purposes, because property and facilities used for school purposes are covered exclusively by the Health/Life Safety Code.

¶ 56     The Board invokes the for-school-purposes test as furthering the state's constitutional mandate to provide public education. The Board argues that differentiating between school property used for school purposes and school property not used for school purposes is supported by section 2-3.12 of the School Code (105 ILCS 5/2-3.12 (West 2012)) and makes logical sense: property used for school purposes supports the constitutional public education mandate and should fall under the Health/Life Safety Code, while property not used for school purposes does not support the constitutional public education mandate and can be regulated by local codes.

¶ 57     We agree that the for-school-purposes test exists and can be traced to the School Code (105 ILCS 5/2-3.12 (West 2012)) and that it even appears in the Health/Life Safety Code (23 Ill. Adm. Code 180.30 (2007)). Further, the test clearly supports the Board's position and, standing alone, is persuasive. However, focusing on section 2-3.12 of the School Code to the exclusion of all other sections is not a proper way to conduct statutory interpretation. See *Krautsack*, 223 Ill. 2d at 553 (the court must give effect to the entire statutory scheme; the words and phrases of the statute must not be viewed in isolation; rather, they must be interpreted in light of other relevant portions of the statute). Thus, while the test is undeniably established and useful, the simple fact of its existence proves nothing without further context, such as a statutory basis, say, the Zoning Change Provision.

¶ 58     The Board also extensively surveys cases in which the for-school-purposes test has been employed, such as cases involving testamentary gifts requiring the property to be used for school purposes (*e.g.*, *Mahrenholz v. County Board of School Trustees*, 188 Ill. App. 3d 260 (1989) (storage); *Wauconda Community Unit School District No. 118 v. La Salle National Bank*, 143 Ill. App. 3d 52 (1986) (storage and athletics)), the authority of school administrations and the proper use of school funds (*e.g.*, *Wright v. Loring*, 351 Ill. 584 (1933) (disbursement on lawful school orders); *Stowell v. Prentiss*, 323 Ill. 309 (1926) (powers of school trustees)), and taxation issues (*e.g.*, *Chicago Bar Ass'n v. Department of Revenue*, 163 Ill. 2d 290 (1994) (bar association offices adjacent to law school); *McKenzie v. Johnson*, 98 Ill. 2d 87 (1983) (constitutionality of tax exemptions for parsonages, fraternities and sororities, and homestead improvements)). The Board cites many more cases, especially tax cases, and we have reviewed them.[6]

_____

[6]Notably, none of these cases involved the Health/Life Safety Code, and none of them used the for-school-purposes test to determine the applicability of the Health/Life Safety Code.

¶ 59    However, the Board cites only one case that used the for-school-purposes test to determine the applicability of the Health/Life Safety Code: *County of Lake*, 325 Ill. App. 3d 694. That case grappled with which building code applied: the Health/Life Safety Code or the county's building code. *Id.* at 702. Even so, while *County of Lake* used the for-school-purposes test to determine whether the Health/Life Safety Code applied to certain school property, it was not in the context of determining whether the Health/Life Safety Code applied instead of the local zoning code. Because none of the cases surveyed by the Board dealt with zoning or land-use issues, they are of limited help, especially where the test is not actually dispositive in the context of zoning or land-use issues.

¶ 60    Based on its survey of cases, the Board concludes that the for-school-purposes test "is the proper test to apply in determining whether school property should be subject to local regulation." With the exception of *County of Lake*, none of the cases surveyed dealt with the Health/Life Safety Code, and none of them involved zoning or land-use issues. The Board's conclusion, then, does not really follow, because the Board has not demonstrated that the for-school-purposes test applies in a zoning situation. Likewise, the Board's conclusion that uses for school purposes fall outside of the City's government and affairs is also unsupported. We therefore reject the Board's contentions on this point.

¶ 61    In addition to its arguments regarding the construction of the School Code, the Board argues that there is no material difference in this case between zoning codes and building codes. In support of this point, the Board cites *City of Galena v. Dunn*, 222 Ill. App. 3d 112 (1991). The Board's analysis of *Dunn*, however, is confusing and contrary to what we perceive to be significant with respect to this case. *Dunn* explored whether an owner of property outside of the city but within 1½ miles of the city's corporate limits was required to obtain a zoning certificate from the city or only a building permit from the county. *Id.* at 118. The Board appears to suggest that *Dunn* stands for the precise proposition that, because there is no statute "authorizing municipalities to impose just 'building' or just 'zoning' requirements on schools," any difference between building codes and zoning codes is immaterial in this case. Actually, *Dunn* recognizes the significant difference between zoning and building codes: zoning codes regulate the height, bulk, and location of structures, the types and intensities of uses to which property may be put, and where in the community various uses may be grouped and located; building codes, by contrast, regulate the strength and construction of buildings and their accessories. *Id.* at 120-21. Thus, we find *Dunn* to be inapposite to the Board's argument and fully supportive of the idea that there is a tangible and important difference between zoning codes and building codes.

¶ 62    To the extent that the Board cites *Dunn* only to highlight its contention that there is no statute empowering the City to impose a zoning code or a building code on a school district, the contention is belied by section 10-22.13a of the School Code, which we have interpreted to subject local school boards to municipal zoning regulations. Accordingly, we reject the Board's contention on this point.

¶ 63    The Board, in an, at best, disingenuous argument, notes that the General Assembly has proposed an amendment to the Zoning Change Provision, which, if enacted, would require school districts and their local school boards to comply with the zoning ordinances of the municipalities in which they are located. The Board ignores and omits the amendment's language stating, "[t]he changes to this Section made by this amendatory Act of the 98th General Assembly are declarative of existing law and do not change the substantive

operation of this Section." 98th Ill. Gen. Assem., Senate Bill 2647, 2013 Sess. The omitted language is of key significance, because where the language of an unambiguous statute is changed, the implication is that the change is a substantive change to the law. *Metropolitan Life Insurance Co. v. Hamer*, 2013 IL 114234, ¶ 25 (generally, an amendment to an unambiguous statute gives rise to the presumption that the legislature intended to change the law, but the presumption may be rebutted by evidence of a contrary legislative intent; where an ambiguous statute is amended, no presumption arises that the legislature intended to change the law).

¶ 64    Here, even if we assume that the Zoning Change Provision is unambiguous, the General Assembly expressly states, in the text of the amendment itself, that it is only codifying what it believes to be the existing law, so the change in language does not represent a substantive change to the law. In other words, the General Assembly expressly rebuts the presumption arising from a change in the statutory language. The Board's argument is disingenuous because, by omitting any reference to the language noted, the Board appears to insinuate (without actually saying) that the law is being changed by the language stating that local school boards and school districts are subject to the local municipality's zoning ordinances. Accordingly, we reject the Board's argument, and we condemn the Board's disingenuity in the strongest possible terms.

¶ 65    The Board argues that, because of the importance of public education and the School Code's effective preemption of the field, a local municipality may not validly enact any ordinance that intrudes upon the field, and this includes zoning regulations. We disagree.

¶ 66    First, we note that the Board is offering a high-level recapitulation of its main argument, but in terms that illustrate a fundamental problem. The argument deals with public education, but the conclusion drawn from the argument deals with land use. Under the constitution and the relevant statutes, "public education" comprises the tasks of educating students and providing safe and appropriate facilities for them. Further, providing facilities involves standards for construction and maintenance. However, but for the Zoning Change Provision, there is nothing in the constitution and relevant statutes addressing zoning and land use. Zoning and land use do not impinge upon any facet of public education, but deal with the orderly arrangement of land use within a municipality as well as the details of siting a structure on property, the structure's allowable dimensions, and its aesthetics. In other words, the conclusion (about zoning and land use) is a *non sequitur* because it does not follow from the propositions (about public education) that the Board is attempting to establish. Logically, then, the argument is fundamentally flawed.

¶ 67    The Board argues that a proper construction of the School Code necessarily prohibits local municipalities from enacting ordinances and regulations impinging in any manner upon public education. Above, we have refuted this argument generally. In short, while the Board seeks to keep the City out of its prerogatives, it is established that home-rule units may concurrently regulate areas already regulated by the state, so long as the legislature has not preempted the field and the matter pertains to the home-rule unit's government and affairs. In other words, "[s]imply because a matter is one of statewide concern *** does not necessarily mean that the matter is not also of concern to local governments"; it is up to the courts to determine which matters are of sufficiently local character so as to be subject to (the concurrent exercise of) home-rule powers and which matters are primarily of statewide

- 18 -

concern and therefore beyond the reach of home-rule powers. *La Salle National Trust, N.A. v. Village of Mettawa*, 249 Ill. App. 3d 550, 575 (1993).

¶ 68    Nevertheless, the Board attempts to cinch its contention that zoning stops at the border of school property by considering only a few specific sections of the School Code, and from them making a sort of hybrid argument that the School Code demonstrates that the state has preempted the field and that anything to do with public schools is of statewide, and not local, concern. Specifically, in the first step of its argument, the Board contends that statewide concern may be inferred from comprehensive legislation. In support, the Board cites *La Salle National* and *JLR Investments, Inc. v. Village of Barrington Hills*, 355 Ill. App. 3d 661 (2005), both of which considered whether disconnection and the operation of local ordinances on the subject of disconnection were of sufficiently local character to stand, or whether disconnection was properly a matter of statewide concern thereby invalidating the local disconnection ordinances. In the second step, the Board points to a number of provisions of the School Code, claiming that they demonstrate that public education is a statewide, as opposed to local, concern. We first consider *La Salle National* and then *JLR Investments*.

¶ 69    The issue posed in *La Salle National* concerned the validity of a local ordinance, which imposed the further step of requiring local approval by referendum after the trial court made a determination that the disconnection petition met all statutory requirements. *La Salle National*, 249 Ill. App. 3d at 573. We concluded that the ordinance was, in fact, invalid and unenforceable. We first approached the question from the standpoint of whether disconnection was a matter of local or statewide concern. We reasoned that, while the disconnection had local effects so that both the local and state governments had reason to be interested in the disconnection, the state had traditionally played a dominant role in regulating disconnection. *Id.* at 575. We noted that the state had the power to change municipal boundaries and that municipal corporations were creatures of the state and were subject to the will and discretion of the legislature. *Id.* at 575-76. Also supporting our conclusion, we emphasized that the village did not and could not cite any case in which a local government exercised concurrent power with the state over a disconnection matter. *Id.* at 576. We also rejected the idea that local governments had traditionally exercised great control over their municipal boundaries, because that contention was supported only with annexation cases, and the annexation statute expressly required that, after a trial court granted an annexation petition, the local government was given a continuing role, whereas in the disconnection statute, the local government's involvement was only as a defendant in the trial court, and its involvement did not continue after the disconnection had been granted. *Id.* Last, we looked to the terms of the statute and concluded that the "careful setting out of the roles of the parties with only a limited role given to the municipality certainly supports a conclusion that the legislature intended disconnection to be a matter of exclusive State control–a matter of statewide concern." *Id.* at 577. We note that the Board cites *La Salle National* solely for the immediately preceding quote and ignores the other bases for our decision. Further, from the immediately preceding quote, the Board concludes that the creation of a "comprehensive statutory scheme" (which, we think, is shorthand for an extremely long statute) implies that the statutory subject is a matter of statewide concern.

¶ 70    Looking at the entirety of the analysis in *La Salle National*, we see that the Board's proposition, that a comprehensive statutory scheme indicates that the statute's subject is a matter of statewide concern, is not an entirely apt summary of that analysis. While the

determination of what constitutes a matter of statewide versus local concern was definitely in play, *La Salle National* focused on the issue of a disconnection from a local municipality. Our analysis considered three general areas: existing authority (whether any cases had been presented), the traditional interests of the state and the local government, and the language of the statute itself. See *id.* at 573-77 ("[t]he determination of whether a given matter is of statewide or local dimension cannot be made on the basis of a specific formula or listing of criteria, but must be made 'with regard for the nature and extent of the problem, the units of government which have the most vital interest in its solution, and the role traditionally played by local and statewide authorities in dealing with it' " (quoting *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 501 (1984))). Key to our determination were the facts that there was no authority to support the proposition that disconnection was sufficiently a matter of local concern to allow a local government to have concurrent powers with the state, and that the language of the disconnection statute provided no role for local government other than that of defendant, while the annexation statute provided a role for local government after the judicial determination.

¶ 71    The Board also relies on *JLR Investments*, in which this court again considered whether disconnection was a matter of local or statewide concern. In *JLR Investments*, we relied on *La Salle National*, which provided little, if any, additional or new analysis on the question, and held, again, that disconnection was a matter of statewide concern. *JLR Investments*, 355 Ill. App. 3d at 666-67.

¶ 72    Both *La Salle National* and *JLR Investments* use a more thoroughgoing analysis than the summary presented by the Board suggests. If the dispositive question were simply whether public education is a matter of statewide concern, the Board's characterization of *La Salle National* and *JLR Investments* would certainly suffice. However, the question actually answered in both *La Salle National* and *JLR Investments* was whether the matter was of sufficiently local character so as to be subject to the concurrent exercise of home-rule powers or whether it was of primarily statewide concern and therefore beyond the reach of home-rule powers. Thus, the two cases employed an analysis that went beyond establishing whether the matter was of statewide concern.

¶ 73    Applying the three parts of the analysis in *La Salle National* here, we get the same result that we have reached above. As noted, *La Salle National* looked at existing precedent, the traditional interests of state and local governments, and the language of the statute. *La Salle National*, 249 Ill. App. 3d at 573-77. Here, the Board has presented no case that is directly on point. Likewise, our research has found no case directly on point. In *La Salle National* and *JLR Investments*, this weighed against the local municipality. We are not so sure that this applies in this case: we wonder if the application of local zoning ordinances to local school boards and school districts has not previously been challenged because it was assumed that they obviously did apply, rather than that they obviously did not. Even if we assume that this aspect of the analysis weighs somewhat against the City, the other two aspects are strongly in favor of the City.

¶ 74    The second portion of the analysis considers the traditional state and local governments' interests. Traditionally, the state has ceded control of land-use decisions to local municipalities. This is seen in the absence of any statewide zoning code and the grant of zoning authority in the Illinois Municipal Code (65 ILCS 5/11-13-1 *et seq.* (West 2012)). On the other hand, the state is concerned with public education (primarily meaning the teaching

of students) to the general exclusion of local municipalities. However, the School Code does not contain any provisions concerned with land-use regulations (with the exception of the Zoning Change Provision, which supports the conclusion that local school boards and school districts are in fact subject to local municipalities' zoning regulations). This point requires weighing the two competing interests, and, since the School Code is silent on land use, presumably the state's interest in regulating school land use is less than the local municipality's interest. Accordingly, we believe that this point tips rather strongly in favor of the City.

¶ 75    Last, we consider the language of the statutes. We have done so above and concluded that, under the principles of statutory construction, local school boards and school districts are subject to local municipalities' zoning regulations. This portion of the analysis also strongly favors the City. Thus, applying the *La Salle National* analysis, we believe that on balance it favors the City's position that the Board is subject to its zoning ordinances.

¶ 76    The Board also argues that the School Code provides "municipalities with a specific, limited role in matters of school construction," citing section 3-14.20 of the School Code (105 ILCS 5/3-14.20 (West 2012)). This section allows a municipality to register to receive notification of the plans for a school district's proposed construction or alteration of a facility. *Id.* The section further allows the municipality to "comment in writing on the plans and specifications based on the [Health/Life Safety Code], referencing the specific code where a discrepancy has been identified." *Id.* The Board is again arguing that, if the legislature had intended for a local municipality to be able to exercise concurrent power over a matter pertaining to public schools, it would have expressly granted that power. We disagree. The section allows the local municipality to comment only on discrepancies between the proposed plans and the Health/Life Safety Code, which, as we have noted, is in the nature of a building code (indeed, the provision refers to the "building code authorized" by section 2-3.12 (105 ILCS 5/2-3.12 (West 2012)) and does not contain provisions regarding land use and zoning. 105 ILCS 5/3-14.20 (West 2012). Moreover, the sections of the School Code to which the Board points all deal with the power to inspect structures or plans for proposed structures, and this power does not on its face (and is not argued to) involve any land-use or zoning issues. Thus, while a fair point, the Board's contention is not adequately supported textually and we reject it.

¶ 77    Based on the foregoing, we have determined that statutory interpretation leads to the conclusion that local school boards and school districts are subject to the zoning code of the municipality in which they reside. Specifically, we held that the Board was properly subject to the City's zoning ordinances. We also reviewed the Board's arguments, those both directly opposed to our conclusions and proffered in favor of its position, and we determined that, while the Board had made some good points, they were ultimately unpersuasive. We now turn to the Board's remaining arguments on appeal.


¶ 78                                D. Other Considerations

¶ 79    While this case presents an issue of apparent first impression, namely, whether local school boards and districts are subject to the land-use and zoning regime of the municipality in which they reside, courts have long been dealing with the issue of when home-rule units may concurrently regulate in areas of statewide concern in keeping with the requirements set forth in section 6 of article X of the Illinois Constitution of 1970. In *City of Chicago v.*

*StubHub, Inc.*, 2011 IL 111127, ¶¶ 24-25, the supreme court noted that *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483 (1984), had clarified the analysis and become settled law. The court divided its analysis into three parts: first, assessing the nature and extent of the problem (*StubHub*, 2011 IL 111127, ¶ 26); next, determining whether the state or the municipality has a greater interest in solving the problem (*id.* ¶ 27); and last, determining whether the state or the municipality has a traditional role in solving the problem (*id.* ¶ 35).

¶ 80     Applying these principles to the facts of this case, we determine that the City may enforce its zoning regulations against the Board. In the first step of the analysis, we must assess the nature and extent of the problem. In our view, the problem is to what extent the City can regulate land uses and zoning on the District's property. The City has a vital interest in regulating the land use of all property in its corporate boundaries. Likewise the state has a vital interest in providing public education to the District's students. It would appear that the two interests here do not conflict.

¶ 81     The Board takes a different view of the nature and extent of the problem. According to the Board, the issue is " 'conserv[ing] the health and safety and general welfare of the pupils and school personnel and others who use public school facilities' " (quoting 105 ILCS 5/2-3.12(a) (West 2012)). We do not believe that the Board has appropriately characterized the problem. In the first place, the *StubHub* analytical framework applies only with respect to whether a home-rule unit may concurrently promulgate regulations in an area of statewide concern, and the Board's conception of the problem deletes the home-rule unit altogether from the equation. The other main problem is that the Board views the problem in terms of its own interest; because the Board is not a home-rule unit, its own interest would seem to be incompatible with an analysis of whether the state has a greater interest in the issue than the home-rule unit. Thus, we reject the Board's framing of the issue and conclude that the state's interest and the City's interest in the problem do not conflict and that, if they overlap, it is in a very small way.

¶ 82     The next step of the *StubHub* analytical framework is to determine whether the state or the City has the greater interest in solving the problem. The regulation of zoning and land use is a local concern in which the state has no interest. There are no statutes that provide for a statewide scheme of zoning. Further, the City's regulation of zoning and land use would not seem to impinge on the state's ability to provide public education through the District. On balance, this step favors the City.

¶ 83     The Board frames this step as determining whether the City or the state "has a greater interest in regulating property used for school purposes." While this is a better statement of the issue than the one offered for the first step, the analysis is a recapitulation of the Board's argument in section A above. We have already dealt with that argument and determined it to be unpersuasive, and the Board's recapitulation offers nothing new or more persuasive. Accordingly, we reject the Board's analysis on this point.

¶ 84     The final step is to determine whether the state or the City has a traditional role in regulating the land use and zoning of the District's property. Once again, there are no state zoning statutes; land use and zoning is traditionally a local issue. Further, the regulation of land use and zoning does not seem to impact the state's ability to provide public education through the District. This step solidly favors the City.

¶ 85     The Board frames the final step similarly to the second step, asserting that the issue "is to determine whether the state or the City has a traditional role in regulating property used for

school purposes." Once again, the Board recapitulates earlier arguments we have already rejected and offers nothing new or more persuasive.

¶ 86    Looking at the totality of the *StubHub* analytical rubric, we conclude that the regulation of zoning and land use of the District's property pertains to the government and affairs of the City. The problem is whether the City's zoning powers will impede the state's ability to offer public education; there appears to be little intersection between zoning and public education such that the City should be precluded from enforcing its zoning ordinances. Likewise, due to the separateness of zoning and public education, the City has a greater interest in solving the problem as well as a traditional role in solving the problem. The Board's argument is problematic, because it has removed the City from its consideration of the issue and substituted itself and the District in considering whose interests are paramount. The Board further conflates the regulation of the District's property with public education, as if they were one and the same thing, and so we determine that its analysis according to the *StubHub* framework is unpersuasive.

¶ 87    The Board argues that various cases support its *StubHub* analysis. We address them in turn and as necessary.

¶ 88    The Board cites *County of Lake*, 325 Ill. App. 3d at 698, for its holding that the Health/Life Safety Code applied in lieu of the county's building code, and concludes from that holding that the Health/Life Safety Code similarly should trump the City's zoning ordinances. We disagree. A building code regulates the construction and maintenance of structures; a zoning code does not. *County of Lake* does not help the Board here.

¶ 89    The Board cites *Board of Education of Community Consolidated School District No. 15 v. City of McHenry*, 71 Ill. App. 3d 904, 908 (1979), to illustrate the difference between regulating a school district (impermissible) and collecting revenue from a school district (permissible). We are not convinced that the Board has properly characterized the holding in that case. That said, the Board seeks to argue that, here, the zoning ordinances represent improper regulation of the business of school construction. We disagree. Zoning ordinances do not interfere with the Health/Life Safety Code, and it is the Health/Life Safety Code that "regulates the business" of school construction. *City of McHenry* is distinguishable and does not help the Board's position.

¶ 90    The Board also cites *City of Joliet v. Snyder*, 317 Ill. App. 3d 940, 944-45 (2000), for the proposition that a municipality may not interfere, through zoning, with the state's attempts to carry out a statutory duty encompassing a statewide concern. The Board implies that it is standing as a proxy for the state and attempting to carry out its statutory duties encompassing the statewide concern of public education. We find *Snyder* to be distinguishable. In that case, the state itself, represented by the Illinois Department of Corrections and the Illinois Department of Human Services, was carrying out its statutory duties. *Id.* Here, the Board is not a state-government-level executive department; rather, it is a local-level entity, on par with, if not below, the City as a unit of local government. Thus, the local government is not impinging upon the state's efforts to carry out its statutory duties.

¶ 91    The Board also cites *Metropolitan Sanitary District of Greater Chicago v. City of Des Plaines*, 63 Ill. 2d 256, 260-61 (1976), for the proposition that a local governmental unit cannot impede a regional governmental entity in the performance of its duties by trying to make the regional entity conform to local regulations. The Board contends that, because its territory spans 2 counties and provides services to 10 municipalities, it should be accorded

the status of a regional governmental entity. We find the Board's proposition to be off point. The issue here is whether the City's zoning ordinances apply to Crystal Lake South High School's reconstructed bleachers. Requiring conformity to the City's zoning ordinances will not prevent the Board and the District from carrying out their duties to provide public education to the residents of the District. Moreover, there is a distinct "not in my backyard" element in *Metropolitan Sanitary*, where the city tried to block the construction of a sewage treatment plant; here, by contrast, the City is not trying to block the construction of a school, instead it is trying to get the reconstructed bleachers to comply with its zoning ordinances, so, once again, there is no issue of frustrating or preventing a regional entity from performing its statutory duties.

¶ 92    The Board cites additional cases that we have not addressed, but they repeat the points raised in the cases that we have reviewed; no purpose other than to further numb the reader would be served to discuss them. With that, we do not believe that the cases cited by the Board further its analysis under the *StubHub* rubric or otherwise help its position.

¶ 93                                    III. CONCLUSION

¶ 94    For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

¶ 95    Affirmed.